McCOY, Plaintiff, v. HANDLIN, State Auditor, Defendant.

(153 N. W. 361.)

(File No. 3812.    Opinion filed June 18, 1915.)

1. Courts—Judges—Supreme Court Judges—Disqualification of— Judges' Expenses, Payment of—Mandamus for Issuance of Expense Warrant—Disqualification Because of Financial Interest—Necessity to Act, as the Only Existing Adequate Tribunal, Notwithstanding Judges' Interest—Circuit Judges, Disqualification of, to Act—Statutes—Constitutional Provisions.

Under Laws 1911, Ch. 239, providing that whenever a judge of the Supreme Court, whose legal residence is at some place other than the state capital, shall have changed his actual residence to the capital, there shall be paid to such judge, in consideration of expenses incident to removal to the capital, the increased expenses of living at the capital, and the expenses of traveling to and from said legal residence the fixed sum of $50 per month, payable upon certified vouchers of the judge filed with the state auditor, held, that, where the state auditor refused to issue warrants to the members of the Supreme Court for the amounts due under said statute, and plaintiff, who, as well as the other judges of said Court, had previously changed his place of actual residence to the capital in order that he might better discharge the duties of his office, brought mandamus in said Court to compel issuance to him of a warrant for $50, the amount claimed by him to be due under said statute for the month of April, 1915, the Supreme Court was

not legally disqualified to hear and determine, consider, and participate in the proceeding, because of financial interest in the questions involved, since a disqualification for interest, if permitted to prevail against action by the Supreme Court, would leave no tribunal in which plaintiff could seek relief, thereby depriving a litigant of his constitutional right to sue and have due process of law, granted to him by the Bill of Rights, Const., Art. 6, Secs. 2 and 20; and therefore the Judges of the Supreme Court may decide this cause; that Court being, in the instant case, the only court having authority to determine the validity of plaintiff's claim and grant him adequate relief; because, while the circuit court has jurisdiction, and might have been applied to for a writ herein, it is customary, whenever, through such writ, a public officer is applied to to perform some ministerial act which, to be of any effect, must be performed within a very limited period, to seek such writ of the Supreme Court, and because also there is a right of appeal from any decision of the circuit court to the Supreme Court, and before an appeal from the circuit court could have been determined by the Supreme Court in the instant case, the date when the current appropriation to meet the provisions of said Ch. 239 elapses (June 30, 1915) would have passed, thus rendering ineffective the writ, while, in determining the questions, constitutional and statutory, involved, the circuit court would have had a direct financial interest, because upon such decision might rest the right of the circuit judge to receive the benefits of Laws 1907, Ch. 49, which provides for reimbursements of certain traveling "expenses" incurred in the discharge of the duties of circuit judges.

2.    **Courts—Decisions—Obiter Dicta—General Expressions in Opinions, Weight Accorded Them.**

   General expressions of the court, in an opinion, if they go beyond the case, may be respected, but should not control the judgment in a subsequent suit when the very point is presented for decision.

3.    **Mandamus—Mandamus Against State Auditor—Warrant for Supreme Court Judge's Expenses—Remedy, Mandamus, or Action Against State—Propriety of Remedy—Statutes, Distinct Remedies Under.**

   The presiding Judge of the Supreme Court brought mandamus against the state auditor, who had refused to issue warrants to the applicant and the other Judges of that Court, for a certain month, to compel him to issue a warrant in payment of the month's allowance in consideration of increased expenses incident to a change of actual residence by such Judge from his legal residence to the capital, pursuant to Laws 1911,

Ch. 239, providing that, where a Supreme Court judge, not a legal resident of the state capital, shall remove thereto, he shall be paid $50 monthly in consideration of such increased expenses; the application being made under Code Civ. Proc., Sec. 764, authorizing the Supreme Court and the circuit courts to issue a writ of mandamus to any person or officer "to compel the performance of an act specially enjoined as a duty resulting from an office, trust, or station," and Sec. 765, providing that the writ "must issue in all cases where there is not a plain, speedy, and adequate remedy in the ordinary course of law." The auditor contended that plaintiff's remedy was by an action at law against the state in the Supreme Court, pursuant to Code Civ. Proc., Sec. 25, et seq., which provide that any person aggrieved by refusal of state auditor to allow any just claim may sue the state. **Held**, that Sec. 25 refers to, and applies only to, cases where the auditor is vested by law with some judgment or discretion as to the amount, if any, of liability on a claim against the state; that, there being no dispute in the instant case as to the amount to be paid, if anything, the payment was a purely ministerial duty, imposed by the statute, and the auditor is vested with no discretion in the matter of allowing the claim, and a writ of mandamus was the proper remedy.

4.  **Mandamus—Mandamus, Distinguished from Action at Law Against State to Recover Claim—Statute—Adequate Remedy at Law, Defined.**

Upon an application, by the presiding Judge of the Supreme Court, against the state auditor, to compel him to issue a warrant upon state treasurer to cover plaintiff's claim for a monthly allowance for expenses, arising under Laws 1911, Ch. 239, providing for payment to judges of said Court not legally resident at the state capital and who have changed their actual residence thereto, shall be paid the fixed sum of $50 per month, for his increased expenses incident to such removal, payable on certified vouchers of such judge, and the auditor having refused to issue warrants to the members of said Court to cover such amounts for a certain month, **held**, that, in the ordinary course of law, an action by such judge against the state, under Code Civ. Proc., Sec. 25, commenced after plaintiff's cause of action had accrued, could not have been prosecuted to final judgment prior to a date when the appropriation for the payment would have lapsed, thus requiring plaintiff to wait, in any event, until the money for that purpose had been appropriated by some future Legislature; that, further, it requires more than a right to recover on a future date to constitute adequate relief and to justify a refusal of relief by mandamus;

that such suit at law is not a plain, speedy, and adequate remedy, since such remedy, to obviate mandamus, must be equally convenient, beneficial, and as effective as mandamus, placing the relator in the same position he would have been in had the duty sought to be enforced been performed; and no substitute for a warrant for $50 on the state treasurer, to which warrant plaintiff is entitled, can afford him an adequate remedy.

5. Constitutional Law—Statute, Validity of—Test of Unconstitutionality of Statute.

State constitutions do not grant powers to the representatives of the people, but such representatives have all powers of the sovereign people not withheld from them by the Constitution, or given to the federal government by the federal Constitution; hence it follows that an act of a state legislature will not be held unconstitutional unless its unconstitutionality appears practically beyond reasonable doubt.

6. Constitutional Law—Statute, Validity of—Interest of Court in Question Determined—Rule of Determination in Such Case.

Where the court has a direct pecuniary interest in the decision to be rendered, it will not be content to base the decision upon the rule that a legislative act will not be held unconstitutional unless its unconstitutionality appears beyond a reasonable doubt, but, owing to such interest, the court should refuse to uphold the act and issue a writ of mandamus in favor of one of the judges of the court, unless it appears clear that, upon both reason and authority, the law in question is constitutional.

7. Judges—Supreme Court Judges—Allowance for Increased Expenses of Living—"Increase of Salary"—"Salary"—"Compensation"—"Pay"—"Wages" — "Fees" — "Perquisites," and "Emoluments," Distinguished from "Expenses."

Laws 1911, Ch. 239, provides that when a Supreme Court judge not legally resident at the state capital shall have changed his actual residence thereto, there shall be paid to said judge, in consideration of expenses incident to removal to the capital, the increase of expenses of living at the capital, and the expenses of traveling to and from such legal residence the fixed sum of $50 per month, payable on the certified vouchers of such judge. Const., Art. 21, Sec. 2, after fixing the salaries of Supreme Court judges, provides that they shall receive no fees or perquisites whatever for the performance of any duties connected with their offices, and prohibits increase of their salaries by the Legislature except as provided in the Constitution itself. Art. 5, Sec. 30, provides that the judges of the Supreme Court shall receive such salary as may be provided by law, consistent with the Constitution, and no such judge shall receive any compensation, perquisite or emoluments for or on account of his

office, in any form whatever, except such salary. The state auditor having refused to pay to the Presiding Judge of the Supreme Court the amount provided by said Ch. 239 to be paid to him, such Judge brought mandamus in the Supreme Court to compel the auditor to issue a warrant covering such amount. **Held,** that the allowance of expenses incident to the performance of his official duty, by a judicial or other officer, is not violative of the constitutional prohibitions against the allowance of perquisites to public officers; since the intent of the statute, in allowing such expenses, was to save the official salary to him free of encroachments thereon, through expenses imposed by his official position; and such expense is not an "increase in salary," a "perquisite," not an "emolument of office," within the constitutional inhibition; the word "emolument" being a term broad and comprehensive, including within it "perquisites," "salary," "compensation," "pay," "wages," and "fees," and the word "perquisites" being defined as a gain or profit incidentally made from employment in addition to regular salary or wages, something gained by a place or office beyond the legal salary or fee, which terms do not include an allowance for expenses, incident to the discharge of the duties of a public office.

McCoy, P. J., taking no part herein.

Application for a writ of mandamus by James H. McCoy against J. E. Handlin, as State Auditor. Writ granted.

*Gaffy, Stephens & Fuller,* and *John Sutherland,* for plaintiff.

*Joe Kirby,* for Defendant.

PER CURIAM. Chapter 239, Laws 1911, provides:

"That whenever a judge of the Supreme Court whose legal residence shall be at some place other than the state capital shall have changed his place of actual residence to the capital, there shall be paid to such judge in consideration of expenses incident to removal to the capital, the increased expenses of living at a place other than his legal residence, the expenses of traveling to and from such legal residence the fixed sum of fifty dollars for each month payable upon the certified vouchers of such judge filed in the office of the state auditor."

This law, if valid, went into effect on July 1, 1911. Ever since that date, and up to April, 1915, the judges of this court, having changed their places of actual residence to the city of Pierre in order that they might better discharge the duties of

their office, did, at the end of each month and upon warrants issued by the state auditor, each receive the said sum of $50. The present state auditor refused to issue warrants to the several members of this court for the amounts claimed by them to be due, under the above law, for the month of April, 1915, wherefore the plaintiff, one of the judges of this court, instituted this proceeding in this court, and seeks a writ requiring the issuance to him of a warrant for the sum of $50, being the amount claimed to be due him as aforesaid. Defendant, in answer to the alternative writ issued herein, contends: (1) That the writ should be vacated, quashed, and set aside (a) because plaintiff has a plain, speedy, and adequate remedy in the ordinary course of law; (b) because, under section 25, C. C. P., plaintiff is compelled to proceed in an action against the state and not against the state auditor. (2) That, owing to their interest in the question involved herein, all the judges of this court are disqualified from hearing, considering, and participating in this proceeding. (3) That said chapter 239, supra, is unconstitutional, being in conflict with section 2, art. 21, and section 30, art. 5, of the Constitution of this state. While defendant contends that plaintiff has a plain, speedy, and adequate remedy in the ordinary course of law, the only remedy suggested, either in defendant's answer or brief, is an action against the state under section 25, C. C. P., which action can be brought in this court only. Thus we have three questions presented: (1) Has plaintiff sought the proper remedy? (2) Has this court, owing to the interest of its members in the ultimate question raised, the right and power to consider and determine the same? (3) Is chapter 239, Laws of 1911, constitutional?

[1] The question which would naturally suggest itself as the one to be first determined is whether this court is without right or power to sit, owing to the undisputed fact that each member thereof has a direct and financial interest in the ultimate question before it. Defendant says:

"It is true that, if this court does not act, there is probably no other tribunal that can try Judge McCoy's case. * * * Judge McCoy will in this case, I am certain, have to wait until the people have provided some other tribunal. At present they have provided only one. That one is the state auditor. His

judgment is now final. No appeal is provided from him, and you, the honorable judges of this court, on account of your interest, cannot sit. It is not left to your discretion to determine whether or not you shall be fair. It becomes an absolute ban prohibiting you from acting."

It is certainly a novel and a startling proposition that, under a constitution vesting the *judicial powers* of the state in her *courts,* an inferior *executive officer* has the right and power to disregard the plain provisions of a statute and refuse to perform a purely *ministerial act required* of him thereunder, thus depriving another of a property right conferred by such statute; and, when the proper judicial tribunal directs that he perform such act or show cause why he shall not do so, he can rightfully say in his return:

"I believe the statute to be unconstitutional, and I deny to the judiciary of the state the right to determine the correctness of my views, because it chances that the judges in whom is vested the power to direct my acts all have a financial interest in the question to be determined."

The mere statement of such a proposition makes plain its fundamental weakness. This is not the first time that the right of this court to act in a matter wherein its members were interested has been questioned. Believing that the terms of office of a majority of the judges of this court would expire in January, 1913, an election had been called for the selection of their successors, and nominations of candidates had been filed in the office of the secretary of state. The relator in State ex rel. Null v. Polley, 138 N. W. 300, 42 L. R. A. (N. S.) 788, contended that there was no authority, under the Constitution of this state, for electing successors of said judges prior to November, 1917. If such contention were correct, the then current term of office of said judges would continue until January, 1918. These judges were therefore directly interested in the issue raised. Their right to sit and determine such issue was questioned. If such judges could not act, it left the secretary of state the final "tribunal" to determine when such terms of office expired, because, without these judges, there was no court to determine such issue. The then members of this court unanimously held that, embarrassing though it was to determine an issue wherein a judge

was directly interested, the interested judges were in duty bound to act, as the relator was entitled to have his contention passed upon. Let us suppose that the then secretary of state had thought that there was no authority for holding an election for judges that year, and had refused to call an election and certify the nominations filed with him. Let us suppose further that, when a writ was asked of this court requiring him to make return as to why he did not call an election and certify such nominations, this court had said:

"This court refuses to act because a majority of its members are disqualified, owing to interest."

Would such a holding "ring true," when its result would have been to perpetuate in office the members of this court until such time as the secretary of state might change his mind or "the people have provided some other tribunal"? We would be content to dispose of the contention that there is no tribunal to which plaintiff can go for relief, by a mere citation of the case of State ex rel. Null v. Polley, supra, if it were not for three things: (1) Because of what defendant's counsel has seen fit to say of this court's decision in the above case; (2) because of the deep and, in every respect, proper interest which the people of this state have in every question presented in the present case; and (3) especially because we recognize the supreme importance of our making the legality, the propriety, and, above all, the duty of our acting herein so clear that the people's confidence in the integrity of this court shall not be shaken.

With the maxim that "no man should be a judge in his own cause," we take no issue. The law should never permit one to have the power, and therefore should never impose upon one the duty, of determining an issue wherein he is materially interested. Judges are but human and, like their fellow mortals, possessed of human frailties; like others, their judgments are liable to be warped and twisted, either consciously or unconsciously, through the influence of self-interest. Certainly no self-respecting jurist, unless duty demands it, will ever consent to sit in judgment upon a matter in issue, in the determination of which he may have any material interest. In fact, no self-respecting jurist would, of his own choice, sit in judgment upon any issue concerning which there might be any well-grounded

suspicion of personal interest on his part.  We quote with ap-
proval the following from the decision in State v. Bd. of Edu-
cation, 19 Wash. 8, 52 Pac. 317, 40 L. R. A. 317, 67 Am. St.
Rep. 706:

"The learned and observant Lord Bacon well said that the
virtue of a judge is seen in making inequality equal, that he may
plant his judgment as upon even ground.  Cæsar demanded that
his wife should not only be virtuous, but beyond suspicion; and
the state should not be any less exacting with its judicial officers,
in whose keeping are placed, not only the financial interests, but
the honor, the liberty, and the lives of its citizens, and it should
see to it that the scales in which the rights of the citizens are
weighed should be nicely balanced, for, as was well said by
Judge Bronson in People v. Suffolk Common Pleas, 18 Wend.
550: 'Next in importance to the duty of rendering a righteous
judgment is that of doing it in such a manner as will beget no
suspicion of the fairness and integrity of the judge.'"

But one of the maxims of jurisprudence is:  "For every
wrong there is a remedy."  Section 2422, C. C.  It would bring
small comfort to any person to quote him this maxim, and yet
advise him that, for reasons peculiar to his particular claim of
wrong, there was no tribunal wherein he could seek the remedy
the law has guaranteed him.  The right, inherent in every mem-
ber of organized society, to a court wherein he may seek a rem-
edy for every wrong, be it real or imaginary, is a right second
and inferior to none other, and is a right which organized society
is bound to guarantee by providing some tribunal into which
every one may go and obtain legal redress for any wrong suf-
fered.  This right is guaranteed by sections 2 and 20 of the Bill
of Rights found in our Constitution, which sections read as
follows:

"Sec. 2. No person shall be deprived of life, liberty or prop-
erty without due process of law."

"Sec. 20.  All courts shall be open, and every man for an in-
jury done him in his property, person or reputation, shall have
remedy by due course of law, and right and justice, administered
without denial or delay."

Under such a constitution, can any one, simply because he
chances to be the judge of a court, or because of any other situ-

ation in which he may be placed, be deprived of his property *"without due process of law"? Can the doors of justice be closed or their opening even delayed to his appeal, and he be deprived or delayed of a remedy "by due course of law," and thus denied "right and justice,"* simply because the only court in which a remedy can be sought is presided over by judges having an interest either like or adverse to that of the one seeking such remedy? The Constitution, the supreme law of this state, answers this question in the negative. The courts, provided by such Constitution, must open their doors to the call of all, and no court can refuse to hear a cause simply because its judges are interested and the law has made no provision for any one to take their places.

In some states there are statutes declaring null and void any judgment rendered by a disqualified judge; and yet the inherent right of every member of organized society to have his rights determined in a court of justice (which right is guaranteed in such states under provisions such as are found in our Bill of Rights) is recognized as a right before which statutes must fall, and the courts of such states uniformly hold that a judgment, rendered by a legally dispualified judge in a case where, if such judge had not acted, the door of justice would have been closed, is valid. We can do no better than to quote the words of Justice Strong of the Supreme Court of New York in the case of People v. Edmunds, 15 Barb. (N. Y.) 529. In that case, as in this, a justice of the court, wherein the action was brought, was seeking by mandamus to compel the payment to him of an allowance other than his salary, as fixed by law. The judge presiding was not financially interested, but he took occasion to review the previous cases arising in that state, wherein judges, having personal financial interest in a question before them, had, owing to the fact that there was no other judge having authority to sit, presided and rendered judgments. After quoting with approval the decision in Re Petition of Leefe and Wife, 2 Barb. Ch. (N. Y.) 39, he said; the italicizing in this and all the following quotations being ours:

"I know of no instance in which official association, or a possible interest in some question involved in the controversy, has prevented judicial action. If there had been any *(indeed, if there*

*had been a positive statutory prohibition), a judge of this court,* upon whom general and unrestricted jurisdiction in law and equity has been conferred by the Constitution, *would nevertheless have been bound to hear and decide a·cause, when the only objections to his action would, if they could prevail, effectually bar the door of justice,* which should be open to all, *against one of the parties."*

In the Leefe case, supra, an appeal had been taken from the decision of the vice chancellor to the chancellor, and the question arose as to whether the chancellor was disqualified to sit, owing to relationship to a party to such appeal. The Constitution of the state gave this right of appeal, *"and the Legislature had made no provision authorizing any other person to sit for him in a case where that officer* (the chancellor) *is related to one of the parties."* The chancellor said:

"The statute, it is true, prohibits any judge from sitting, where he is related to either of the parties within the · ninth degree of affinity or consanguinity; but *it has not provided for any other person, or tribunal, to exercise the appellate power, which is given to the chancellor, by the Constitution, in such cases. The Constitution must, therefore, control, as that is the paramount law."*

Having our attention called, by the case of State ex rel. Null v. Polley, supra, to the fact that there was no law under which a proper person could be appointed to take the place of a member of this court when such member should not sit, the then members of this court, through one of its· members who chanced to be the chairman of the committee on legal reform of the state bar association, called the attention of such association to the need of an amendment to the Constitution of this state authorizing the enactment of such a law. Such association recommended to the Legislature that it submit such an amendment to the people for their adoption, and the Legislature, by chapter 135, Laws 1913, submitted an amendment, which provided :

"Whenever, in the opinion of the Supreme Court, one or more of its judges shall be disqualified, by reason of interest or other cause, from taking part in the decision of any particular action or proceeding, and the court shall deem it necessary, a

person, or persons, shall be selected, in such manner as the Legislature shall provide, to serve in place of such disqualified judge or judges, only for the purpose of deciding such particular action or proceeding."

This amendment was rejected by the people in November, 1914. One can explain this action of the voters upon one ground only—that they did not understand the purpose and importance of the proposed amendment. We trust that one result of the present action will be the awakening of the people of this state to the importance of enacting such an amendment, and by so doing prevent the judges of this state being placed in the embarrassing position in which the members of this court now find themselves—forbidden by the Constitution from closing the doors of this court to any person entitled to admission therein, and yet knowing that, when we do the duty thus imposed upon us, we must suffer unjust criticism from the thoughtless and from those whose criticism may be inspired by unworthy motives.

Certainly the members of this court and, we firmly believe, all the people of this state would today be thankful if the proposed amendment to our Constitution had been adopted and the last Legislature had authorized the appointment of qualified persons to sit as a court to determine the matter now before us, so that we could, as did the members of the Supreme Court of Arkansas, in Ferrell v. Keel, 103 Ark. 96, 146 S. W. 494, in a case involving the validity of the general appropriation bill under which, as in this state, the salaries of judges of the Supreme Court are paid, simply say:

"An order will therefore be entered announcing the disqualification of the judges, and the clerk is directed to certify the same to the Governor, to the end that special judges may be appointed to sit in the case."

It certainly is pertinent to ask: If counsel's contention is correct, what would become of the government of this great state (of its executive and judicial departments, its educational and other public institutions), provided the defendant, or some one of his successors, should, upon a claim that he believed the then current general appropriation bill to be invalid, refuse to issue any warrants thereunder? The doors of every court in this state would be closed to those who might seek to have the

validity of such appropriation bill determined. It is no answer to say that defendant has not questioned the validity of such appropriation bill, and that neither he nor his successor ever will. Who is there that can say that circumstances may not arise making it the bounden duty of some future auditor to question such a bill? The true test of the correctness of a legal proposition is not to be found merely in its application to certain present facts, but more often it is to be found in its application to supposed facts and circumstances.

Defendant's counsel, in his brief, asserts that the holding in the case of Dimes v. Grand Junction Ry. Co., 3 H. L. C. 759 (which case was cited by this court as sustaining its decision in State ex rel. Null v. Polley, supra), does not sustain such decision; he even asserts that it is absolutely contrary to such decision; and he purports to quote therefrom in support of such assertion. This certainly would be surprising, if true, in view of the fact that this English case is almost universally cited, both in reports and text-books, as supporting the proposition announced in State ex rel. Null v. Polley, supra. The learned counsel is in error. Charity would require us to conclude that he failed to carefully read the decision in such case, as otherwise we can find no possible explanation of what, if it be intentional, is a most serious breach of professional duty (a breach of professional duty of which we would be loth to believe counsel would be guilty—the quoting, as the decision of a court, the mere argument of counsel submitted to such court). But we cannot understand how a lawyer, of the experience of the learned counsel for defendant, could fail to discover the Dimes case time and again quoted in support of the proposition announced in State ex rel. Null v. Polley, supra. Such a discovery should have called him to a second and more careful reading of the decision in that case, if his sole desire were to aid this court in a correct solution of the questions presented to it. After stating the nature of the matter before the House of Lords in the Dimes case, counsel, in his brief, purports to quote some four pages from the opinion in that case. An examination of such case, as reported, discloses the fact that the matter quoted is taken wholly from the argument of counsel for appellant therein, and does not contain a single word from the opinions rendered therein. Counsel has

failed to quote from the argument of respondent's counsel in the Dimes case, which argument follows immediately after the quotation found in his brief, in which argument the respondent's counsel say, in relation to the authorities mentioned in the quotation presented to this court:

"All the cases quoted are those of *inferior jurisdictions whence there was an appeal* or of courts where there were many members composing them, *so that it was not a matter of necessity to resort to the decision of the individual who might happen to have an interest in the question discussed.*"

It was not the argument of counsel upon either side, but the opinions in the Dimes case, that this court had in mind when it cited such case as an authority supporting our decision in State ex rel. Null v. Polley, supra. Two questions were presented for the determination of the House of Lords in relation to the validity of the acts of the Lord Chancellor, who, it appeared, had an interest in a judgment, which judgment he had affirmed upon appeal from the Vice Chancellor, who had rendered same. One of these was the validity of his judgment of affirmance; the other, the validity of the proceedings by which the case was brought to the House of Lords—such proceedings resting upon an enrollment signed by the Lord Chancellor, and it being contended that the Lord Chancellor, if disqualified from rendering judgment upon appeal, was also disqualified from signing such enrollment, and that therefore the cause was not properly before the House of Lords. Certain questions were referred to the judges for their answer. In answering such questions, Baron Parke announced the unanimous decision of the judges, wherein, after discussing the validity of the judgment of affirmance and holding that such judgment was not void but voidable and upon appeal should be avoided, the judges took up the question of the jurisdiction of the House of Lords dependent upon the enrollment signed by the Lord Chancellor, and said:

"But, in order to appeal against them to the House of Lords, *they must be enrolled; and enrollment cannot be made without the Lord Chancellor's signature.* In giving that signature the Chancellor has a discretion which he may exercise. But he may be applied to for that purpose, and, if he gives his signature, his interest affords no objection to its validity. *For this is a case*

*of necessity, and, where that occurs, the objection of interest cannot prevail.* Of this the case in the Year Book (Year Book, 8 Hen. 6, 19; 2 Roll. Abr. 93) is an instance, where it was held that *it was no objection to the jurisdiction of the common pleas that an action was brought against all the judges of the common pleas, in a case in doubt which could only be brought in that court."*

It will be seen from the above that the judges recognized clearly this rule of necessity before which all other rules of law must fall. Following the opinion of the judges, the then Lord Chancellor, who had succeeded the Lord Chancellor whose action was under review, announced his opinion, which opinion was concurred in by Lords Brougham and Campbell. The Lord Chancellor said:

"Now, as the suitor *has a right to come directly from the Vice Chancellor to your Lordship's House,* the appeal here would stand correctly before the House as an appeal, not only against the affirmance, which may be considered, for the purpose of observation, as void, on account of the Lord Chancellor's interest, but as an appeal on the merits against the decision of the Vice Chancellor, and, as such, proper to be heard at your Lordships' bar. I understand the opinion of the judges to be that the interest of the Lord Chancellor was such as disqualified him from judging in the cause; and I must therefore infer that, *in their opinion, here was no such absolute necessity for his adjudication as, upon the ground set forth in some of the cases, might be deemed to render his decision effectual."*

Why was there no such "absolute necessity" as "might be deemed to render his decision effectual"? Simply because there was another tribunal to which the appeal from the Vice Chancellor could be taken, as the appellant *"had a right to come directly from the Vice Chancellor to your Lordships' House."* It will thus be seen that twice, once in the decision of the judges and aagin in that of the Lord Chancellor, it was recognized that the rule, forbidding a judge to act in a matter wherein he was interested, must give way to necessity, and that, where it is necessary for him to act, his act will be valid and effectual, regardless of any interest. It is therefore clear that counsel was absolutely in error when he stated that this English authority did

not support the holding of this court in State ex rel. Null v. Polley, supra.

[2] Defendant's counsel quotes the following from the decision in State ex rel. Null v. Polley, supra:

"It is elementary that no man may sit in judgment upon his own cause, and no citation of authorities is necessary to demonstrate the law. *It is, however, almost universally held that the rule is one which must yield to necessity*"
—and then contends that the italicized words were not required in determining the matter then before us, "and must be treated as obiter." It being absolutely necessary, to the determination of the matter then before us, that we should hold that this court was bound to sit and determine the cause regardless of the interest of the majority of the court, it is apparent that the words italicized by counsel were an essential part of the court's decision and in no sense "obiter." We full agree with Chief Justice Marshall's statement in relation to any "obiter" statement or dictum. In Cohen v. Virginia, 6 Wheat. 264, 399, 5 L. Ed. 257, he said:

"It is a maxim, not to be disregarded, that general expression, in every opinion, are to be taken in connection with the case in which those expressions are used. *If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.* The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

Counsel for defendant is certainly familiar with such maxim, and yet he has cited but two cases, other than the Dimes case above referred to, in which he claims the courts have held contrary to our views in State ex rel. Null v. Polley, supra. These cases are Washington Ins. Co. v. Price, 1 Hopk. Ch. (N. Y.) 1, Id., 2 N. Y. Ch. 321 (1823), and Oakley v. Aspinwall, 3 N. Y. 547 (850). A reading of these cases reveals the fact that, while the court, in each case, made statements, quoted by counsel in his brief, which statements, if they were not obiter, would be

authority for counsel's contention, yet it clearly appears, in each case, *from the holding of the court itself*, that it was unnecessary for the disqualified judge to act in order that the parties be not denied a court. In one case, an appeal was taken to a disqualified chancellor, and he held that there were other courts open to the parties. In the other case, there was a quorum of the judges of the court qualified to sit, and thus there existed no necessity requiring a disqualified one to sit in order that there might be a court. It thus appears that all that was said by the chancellor and the judge upon the question now before this court was unnecessary to the decisions rendered, and therefore "obiter" to the real questions decided by such courts. Counsel has apparently failed to read carefully the opinion in Oakley v. Aspinwall, as he has failed to discover that the court fully recognized the proposition announced by us in State ex rel. Null v. Polley, supra, This he should have discovered, because the Oakley case has been frequently cited by courts and text-writers as an authority in support of such proposition. Judge Hurlbut said:

"But it may be said that this court consists of eight judges; that a less number cannot constitute it; and therefore from necessity its members must sit in all cases. * * * It being provided by law that six members of the court shall constitute a quorum, *a judge, who is interested or related to a party to a suit, cannot be required to act from necessity, unless when at least three of the judges may be so circumstanced*—a case not likely to occur."

We are therefore confronted with this unusual situation— counsel denouncing as unsound a former holding of this court and yet failing to cite anything, entitled to recognition as authority, in support of his contention, while two of the three cases cited by him are absolutely opposed to such contention.

Let us see what other courts, besides those hereinbefore referred to, have said upon this question, and in many cases when their statements were an essential part of their decisions. Referring to other decisions rendered by the courts of New York (those being the courts rendering the decisions heretofore referred to as cited by defendant), we find the following:

In Paddock v. Willis, 2 Barb. Ch. 331, Id., 5 N. Y. Ch. 663, the vice chancellor, in refusing to sit in a case when he was

related to one of the parties thereto, said of the rule forbidding a judge to sit in a cause where he is disqualified:

"The only exception to this principle is where the Constitution has conferred the jurisdiction upon a particular judge, or tribunal, and no provision is made by law for hearing and deciding the matter in controversy, when the judge is related to either of the parties in the suit. There, *the Constitution being the paramount law, the judge, or tribunal, to whom the Constitution has confided the decision of the matter, must from the necessity of the case hear and decide it, to prevent a failure of justice.*"

The exception to the general rule was again recognized in Converse v. Arthur, 17 Barb. (N. Y.) 410, decided in 1854, being subsequent to the decisions cited by defendant; the court saying:

"*A judge, it is said, may sit, where jurisdiction is conferred by the Constitution* (the fact in the case at bar), *and upon no other tribunal, for otherwise there will be a failure of justice.*"

In 1896, in the case of People v. Trustees, 4 App. Div. 399, 39 N. Y. Supp. 607, the court recognized this exception in the following language:

"Cases are to be found where judicial officers, or officials acting in a judicial capacity, have been permitted to act, notwithstanding the disqualification of interest, but I think, without exception, *they have all been cases where, unless such officer was permitted to act, there would have been a failure of justice, for the reason that there was no other person who could act.*"

Again in the year 1900, in People v. Magee, 55 App. Div. 195, 66 N. Y. Supp. 849, the court, in a most extreme case, said:

"By the statute the police commissioner was the only tribunal authorized to try charges against the relator. Whatever may be his prejudice, therefore, his jurisdiction is undoubted, for otherwise the relator could not be tried or removed, however flagrant his offenses. If this proposition need authority, it is abundant. See People v. Williams, 51 App. Div. 102, 64 N. Y. Supp. 457; People v. Common Council, 85 Hun, 602, 33 N. Y. Supp. 165; In re Ryers, 72 N. Y. 1, 28 Am. Rep. 88."

And again, as late as the year 1910, in Wilcox v. Supreme Council of Royal Arcanum, 66 Misc. Rep. 253, 123 N. Y. Supp.

83, we find the exception fully recognized. In Bliss v. Caille Bros., 149 Mich. 601, 113 N. W. 317, 12 Ann. Cas. 513, the court said:

"It is well established that *the rule of disqualification of judges must yield to the demands of necessity; as, for example, in cases where applied it would destroy the only tribunal in which relief could be had.*"

In Galey v. Board, 174 Ind. 181, 91 N. E. 593, Ann. Cas. 1912C, 1099, the court said:

"The maxim that one shall not be a judge in his own case is a sound and salutary one, and should not be relaxed, *except when necessity requires.*"

In Pearce v. Atwood, 13 Mass. 324, the court said:

"Any *interest, therefore, however small,* has been held sufficent to render a judge incompetent. *The only exception known,* to this broad and general rule, *exists where there may be a necessity* that the person so interested should act, *in order to prevent a failure in the administration of justice.*"

In Board of Supervisors v. Board of Supervisors, 20 Wis. 139, in supporting the action of the judges of such court in deciding causes wherein they were interested, the court said:

"And it is obvious that *from necessity they must have acted* in such causes, *to prevent a failure of justice.*"

We cannot better close this part of our decision than by quoting the following from the great case of State ex rel. Cook et al. v. Houser, Secy. of State, 122 Wis. 534, 100 N. W. 964, decided in the year 1904. That court said:

"But going further, and conceding for the moment that the proposition last discussed could, in any event, be resolved in favor of the position of counsel for the plaintiff, *we meet at once the stern rule of necessity, which puts aside all the grounds for judicial disqualification, when otherwise there would be no tribunal whatever to administer* any remedy for the grievance waiting for redress. The courts, in treating that rule, will be found generally to have restricted it to the precise case in hand, and yet to have viewed it sufficiently broad as to fully suffice therefor. * * * This court has recognized the rule of necessity, where otherwise the one empowered to apply his judgment to the matter would have been disqualified, in Board of

Suprvisors of Jefferson County v. Board of Supervisors of Milwaukee County, 20 Wis. 139. The same rule justified Chancellor Kent in Stuart v. Mechanics' & Farmers' Bank, 19 Johns. (N. Y.) 496, to keep his place upon the bench, though pecuniarily interested in the trial before him. In Matter of Leefe, 2 Barb. Ch. (N. Y.) 39, Chancellor Walworth deemed himself justified by it in presiding, though one of his relatives was a party, and by express statutory provision he was disqualified. In Mooers v. White et al., 6 Johns. Ch. (N. Y.) 360, Chancellor Kent again leaned on that rule in presiding, though by the literal sense of the statute disqualified, as in the case aforesaid. In the Yr. Book, 8 Hen. 619, 2 Roll. Abr. 93, *the judges who presided relied upon the same rule in performing their duties, though all were defendants in the action.* That is referred to as a very apt illustration of the extent to which the rule has been applied in Mayor of London v. Marwick, 11 Mod. 164. Further to the same effect are in re Ryers et al., 72 N. Y. 1, 28 Am. Rep. 88; Thellusson v. Rendlesham, 7 H. L. Cas. 428; Commonwealth v. McLane, 4 Gray, (Mass.) 427; Ten Eick v. Simpson, 11 Paige (N. Y.) 177-179; People v. Edmonds, 15 Barb. (N. Y.) 529-531. It should be noted that in the authorities, to which plaintiff's counsel can best turn to sustain their contention on this, the rule we are discussing is fully recognized. Stockwell v. Township Board of White Lake, 22 Mich. 341; State, etc., v. Crane, 36 N. J. Law, 394; State of Washington, etc., v. Board of Education, etc., 19 Wash. 8, 52 Pac. 317, 40 L. R. A. 317, 67 Am. St. Rep. 706. In addition to the foregoing on the same subject, the following are peculiarly in point: People, etc., v. Common Council, 85 Hun, 601, 33 N. Y. Supp. 165; People v. Commissioners, etc., 84 Hun, 64, 32 N. Y. Supp. 18; People v. Board of Trustees, 4 App. Div. 399, 39 N. Y. Supp. 607; People, etc., v. Magee, 55 App. Div. 195, 66 N. Y. Supp. 849; People, etc., v. Sherman, etc., 66 App. Div. 231, 72 N. Y. Supp. 718, affirmed, 171 N. Y. 684, 64 N. E. 1124; Miller v. Elmendorf, 51 App. Div. 173, 64 N. Y. Supp. 775."

It is therefore clear that, under both reason and authority, the law is as announced in 23 Cyc. 581.

"The rule as to the disqualification of judges must yield to the demands of necessity. *Where disqualification, if permitted to*

*prevail, destroys the only tribunal in which relief may be sought, and thus effectually bars the door of justice, the disqualified judge is bound to hear and decide the cause.* But, to justify a disqualified judge in sitting in a cause in which he is directly interested, the necessity must be imperative, in the determination of which the greatest care should be exercised."

Plaintiff, believing himself entitled to the expense warrant demanded, had the same right that every other citizen of this state has—to go into court and seek "right and justice, administered without denial or delay." There was only one court to which he could go for relief. He could not be asked to wait until the people had provided another tribunal, because: (1) To do so would, at best, deprive him of a constitutional right (speedy justice) ; (2) there was nothing to encourage him in the belief that any such tribunal would ever be created; (3) to so wait would be misconstrued by many as a confession that he had knowingly taken money under an invalid law. Defendant left to plaintiff but one course to pursue—to go at once before the only court having authority to determine the validity of his claim and to grant him adequate relief, and there demand his legal rights. We refer to this court as "the only court having athority to determine the validity of his claim and to grant him adequate relief," because, while the circuit court has jurisdiction to issue writs of mandamus and might have been applied to for a writ herein, it is customary, whenever, through such a writ, it is sought to require a public officer to perform some ministerial act, which, to be of any effect whatsoever, must be performed within a very limited period, to seek such writ of this court because, from any decision of the circuit court, there is a right of appeal to this court, and a considerable time must necessarily elapse before such an appeal can be taken and brought on for hearing in this court. This is but another application of the rule of necessity. Thus, if this proceeding had been started in the circuit court, before an appeal could be brought to and determined by this court, June 30, 1915, the date when the current appropriation to meet the provisions of chapter 239, Laws 1911, supra, lapses, would have passed and the appropriation have lapsed, rendering absolutely ineffective the writ sought for. Furthermore, it is clear that the circuit judges of this state are equally disqualified

to determine the rights of plaintiff to the relief sought as are the members of this court. Two questions are presented in considering the provisions of chapter 239, Laws 1911: (1) Is the allowance therein provided for an allowance for expenses? (2) If it is an allowance for expenses, is such statute constitutional? Chapter 49, Laws 1907, provides that the circuit judges shall be reimbursed for certain "expenses" incurred in the discharge of their duties. There can be no question but that the allowance to the circuit judges is one for expenses. It is therefore apparent that, if this proceeding had been brought before a circuit judge, he would have had a direct financial interest in the determination of these questions, as upon the answer he gave to the same might rest his right to receive the benefits of said chapter 49, Laws 1907. He would have a direct interest in the answer to the first question, as thereon would depend the necessity of his answering the second question, the answer to which is as vital to his rights as it may be to those of Judge McCoy. It was undoubtedly a consideration of all these matters (the equal disqualification of the circuit judges; the fact that the writ, to be effective, must be given in such a short time; and the further fact that this matter could not reach a final determination within such brief period, if commenced in the circuit court) which led counsel for defendant to state in his brief:

"It is true that, if this court does not act, there is probably no other tribunal that can try Judge McCoy's case."

[3] Has plaintiff sought the proper remedy? This proceeding was instituted under the provisions of section 764, C. C. P., but it is contended by defendant, in his return, though not even suggested in his brief, that plaintiff's remedy is by action at law in this court under the provisions of section 25, C. C. P., and succeeding sections. Through such failure to present this matter in his brief, we might deem this contention abandoned by defendant and not refer to it further, but we prefer not to so dispose of it. The remedies provided by sections 25 and 764 are radically different, and there is a well-defined line of demarcation between the classes of cases that come within the provisions of these two sections. Section 764 authorizes the Supreme and circuit courts to issue the writ of mandamus to any person or officer, "to compel the performance of an act which the law spe-

cially enjoins as a duty resulting from an office, trust, or station";
and section 765 provides that the writ "must be issued in all
cases where there is not a plain, speedy, and adequate remedy,
in the ordinary course of law." It will be noted that the writ will
issue to compel the performance of an act that the law speci-
fically enjoins as a duty, and this means that it can issue to com-
pel the performance of such act *only* as the law specifically en-
joins as a duty. If the duty to perform the act depends upon the
judgment of the officer charged therewith, or if, under the facts
presented, he is vested with any discretion in the matter of per-
formance, mandamus is not the proper remedy.

By the provisions of section 25, any person deeming himself
aggrieved by the refusal of the state auditor to allow any just
claim against the state may commence an action at law against
the state in the Supreme Court. If he recovers judgment, the
clerk of the Supreme Court shall furnish a certified transcript
of the judgment to the state auditor, who shall audit the amount
of the judgment, and the same shall be paid out of the state
treasury. These provisions of the law have reference to, and
apply only to, cases where the auditor is vested by law with
some judgment or discretion as to the amount, if any, that shall
be allowed on a particular claim against the state. If the claim
is rejected or if allowed in part, and the claimant is dissatisfied
with the allowance, then his remedy is by an action at law in
this court, as provided by section 25 and succeeding sections; but,
when a claim, based upon a valid law, has once been audited and
allowed by the auditor himself or by some other duly authorized
person, board, or tribunal, or the amount thereof is fixed by law,
so that there is no dispute as to the *amount* of the claim, it then
becomes the duty of the auditor to allow it and to issue a war-
rant upon the state treasurer therefor, provided of course, that
money has been appropriated for the payment thereof. In such
cases, the auditor is vested with no discretion, and the issuance
of the warrant is a pure ministerial act, the performance of which
in case of refusal, will be compelled by mandamus. The dis-
tinction may be made clearer by illustration. If a bill for labor
or supplies furnished to the state is presented to the auditor for
allowance, it is his duty to audit it. If he allows it in part or
in whole, and the claimant accepts such allowance, it is then the

duty of the auditor to issue a warrant in payment thereof; and, if he refuse, mandamus will lie to compel him to issue it. But the auditor cannot be compelled by mandamus to allow the claim at any particular amount, and, if the claimant is dissatisfied with the allowance as made, his remedy is by action at law, under the provisions of section 25. On the other hand, where the amount claimed is fixed by law (as, for instance, an officer's salary), the auditor is vested with no discretion whatever. If he is satisfied as to the identity of the officer claiming the salary, it is his duty to issue his warrant for the amount so fixed. In that case, there is nothing to be determined by an action at law, and, if the auditor refuse to issue the warrant, mandamus is the proper remedy to compel him to issue the same.

The above principles are recognized by the courts of this country generally. 20 Cyc. 235. In Black v. Auditor, 26 Ark. 237, that court, after quoting the section of their statute allowing suits to be brought against the state, and which, in all material matters, is similar to our section 25, said:

"The salaries of the circuit judges are fixed by law. An appropriation has been made to pay these salaries. The ministerial duty of auditing the accounts and issuing his warrant, for the amount, is all that remains to be done. If suit were brought against the state, under the sections above quoted, and an appropriation made by the Legislature, the same ministerial duty would remain to be performed."

This has special application to the present case, because the only fact to be determined at a trial is already determined, to-wit, the *amount* due to plaintiff; and, even after a judgment in an action at law, it would still be necessary to issue the warrant. In Rice, Auditor, v. State ex rel. Drapier, 95 Ind. 33, that court said:

"Whenever the money necessary to pay a particular claim against the state has been appropriated by the Legislature, and the amount of the claim has been definitely ascertained in a manner prescribed by law, a refusal by the auditor of state to draw his warrant upon the treasurer of state for the payment of the claim will authorize the interposition of the courts by appropriate mandatory proceedings. In such a case it is not a sufficient

objection that such proceedings afford an indirect method of suing the state."

In Bryan v. Cattell, 15 Iowa, 538, the Supreme Court of that state said:

"All the cases, as well as the statute, recognize a distinction between those acts resting in discretion and such as are plainly, clearly, definitely prescribed by law. Thus the auditor is required to settle all claims against the treasury. * * * Now, his judgment or discretion as to the amount he should allow on such settlement could not be controlled by *mandamus* but he could be compelled to act, or, after he had thus settled the amount due the claimant, he could be compelled to grant the required certificate. * * * And whether there is a discretion is, of course, to be determined by the courts, in each case, where the process of *mandamus* is invoked. If there is, then, though ever so unwisely exercised, there can be no interference. If not, then the omission or performance of an act, specially enjoined by law, as resulting from the office, may be compelled."

A few others of the many cases to the same effect are White v. Worth, 126 N. C. 570, 36 S. E. 132; State ex rel. Bache v. Richards, 15 Utah, 477, 49 Pac. 532; State ex rel. Maddox v. Kenney, 10 Mont. 533, 26 Pac. 999; Swann v. Buck, 40 Miss. 268; Gilbert v. Moody, 3 Idaho, 3, 25 Pac. 1092; Page v. Hardin, 8 B. Mon. (Ky.) 648. The right to the writ, under the circumstances shown in this case, has been recognized in this state. Howard v. Burns, 14 S. D. 383, 85 N. W. 920.

Chapter 239, Laws of 1911, allows to each Supreme Court judge, who removes to the capital for the performance of his official duties, the fixed expense allowance of $50 per month, payable upon the certified vouchers of such judge. It is alleged by plaintiff and admitted by defendant that plaintiff has complied with all the requirements of this law. It is further alleged and admitted that the Legislature of 1913 made an appropriation of funds with which to pay this specific amount, and that this fund is now on hand in the state treasury and available for this very purpose. The claim is audited at a fixed amount by the law itself. The defendant is vested with no discretion whatever in the matter of allowing the said sum of money. Mandamus is the proper mode of compelling him to perform the purely minis-

terial act of issuing the warrant. Evans v. Bradley, 4 S. D. 83, 55 N. W. 721. The contention of defendant that plaintiff's remedy is by action under section 25, C. C. P., and not by mandamus, can scarcely be taken seriously, and it apparently was not so taken by defendant himself or he would have discussed the same in his brief.

[4] Defendant, in his return, contends that plaintiff has a plain, speedy, and adequate remedy at law. Inasmuch as this contention is not referred to in his brief, and the return does not suggest any other remedy at law, except that under section 25, C. C. P., we need only suggest, in addition to what we have said above in regard to an action at law, that, in the ordinary course of law, an action commenced under section 25, after plaintiff's cause of action had accrued, could never be prosecuted to final judgment prior to the 1st day of July, 1915, and defendant admits that unless the money, appropriated for the payment of plaintiff's claim, is paid prior to that date, said appropriation will lapse. In that case, plaintiff could not be paid in any event until the money for that purpose had been appropriated by some future Legislature. In the second place, it requires more than a light of recovery in the future to constitute adequate relief and to justify a refusal of relief by mandamus.

"The 'other remedy,' the existence of which will oust, or, rather, prevent the invocation of, jurisdiction by mandamus, must be equally convenient, beneficial, and effective, as mandamus * * * It must be a remedy which will place the relator in statu quo; that is, in the same position he would have been had the duty been performed. Etheridge v. Hall, 7 Port. (Ala.) 47. Indeed, it must be more than this. It must be a remedy which itself enforces in some way the performance of the particular duty, and not merely a remedy which in the end saves the party, to whom the duty is owed, unharmed by its nonperformance. Sessions v. Boykin, 78 Ala. 328; 2 Spelling, Extraordinary Relief, § 1375; Merrill, Mandamus, § 53. Hence it is that, while mandamus will not lie to enforce a duty which may be coerced by the ordinary civil actions at law, as where the duty is merely to pay money or to deliver property, it does lie whenever such actions cannot be availed of to the specific performance of the official act which the relator is entitled to have performed, as where a disbursing

officer refuses to draw a warrant it is his duty to draw, in which case an action for damges, while it would eventually save the relator harmless, would not coerce the discharge of the specific duty." State ex rel. Brickman v. Wilson, 123 Ala. 259, 26 South, 482, 45 L. R. A. 772.

The above language is especially appropriate when applied to the facts in this case. Conceding that plaintiff has a cause of action against the state that could be maintained under the provisions of section 25, C. C. P., and that the money now due could eventually be recovered, this would by no means afford plaintiff the specific and adequate remedy to which he is entitled. Under the provisions of chapter 239, Laws 1911, plaintiff is entitled to a warrant on the state treasurer for $50, and no substitute for such warrant or means, however certain, of collecting said sum of money in the future, can afford him adequate relief.

[5-7] This brings us to a consideration of the one ground assigned by defendant for refusing to issue the warrant demanded, to-wit, the claim that said chapter 239, Laws 1911, is unconstitutional because in conflict with section 2, art. 21, and section 30, art. 5, of the Constitution of this state.

Section 2, art. 21, after fixing the salaries of the Governor, Supreme and Circuit Court Judges, Secretary of State, the State Treasurer, State Auditor, and Commissioner of School and Public Lands, the Superintendent of Public Instruction, the Attorney General, and the Lieutenant Governor, provides:

"They shall receive no fees or perquisites whatever for the performance of any duties connected with their offices. It shall not be competent for the Legislature to increase the salaries of the officers named in this article except as herein provided."

Section 30, art. 5, provides:

"The judges of the supreme court, circuit courts and county courts shall each receive such salary as may be provided by law, consistent with this Constitution, and no such judge shall receive any compensation, perquisite or emoluments for or on account of his office in any form whatever, except such salary: Provided, that county judges may accept and receive such fees as may be allowed under the land laws of the United States."

The argument presented by defendant's counsel in his printed brief is certainly unusual, and we believe counsel himself, upon mature reflection, will feel that much that he has said was wholly uncalled for and highly improper, not an aid to the court in arriving at the proper legal conclusion, for which every brief should be designed. Counsel says:

"It would take only a child, simply, were he not biased, to see that the donation offered you under section 239 is nothing but graft. The reason it is given is on account of the pitiable salary which is attached to your office. * * * If they (the Legislature) possessed this power, then the amount they may give, or you may take, is limited only by their judgment, or your avarice."

He also says:

"Could I stand before you, convinced clearly, as I am, that the act of the Legislature attempting to give you $50 per month in addition to your salary clearly violates the Constitution, and ask you to hold yourselves guilty? Could you admit your guilt? And still I am a lawyer as well as yourself. Probably my knowledge based on a long period of study, would not differ much from the average of the bench."

The only thing to be found in counsel's brief, which could in any manner throw light upon the question now under consideration, is the definition of the word "perquisite," as found in Webster's New International Dictionary, and another definition found in Bouvier's Dictionary, which latter definition is approved in the case of Wren v. Luzerne Co., 9 Pa. Co. Ct. R. 22, a decision of a county court cited by defendant. With these definitions we fully agree. The only other authority cited is a decision by the Supreme Court of Maryland (Vansant v. State, 96 Md. 110, 53 Atl. 711), holding that an officer is not entitled to retain interest on public funds held by him in his official capacity—a question entirely foreign to the one before us. Counsel for defendant has misquoted section 30, art. 5, of the Constitution, making what we deem a material change. Instead of quoting it as providing that the officers therein named shall receive no "compensation, perquisite or emoluments for or on account of his office, *in any form whatever,* except such salary," he has inserted, in place of the italicized words, the words "on any account." We trust this

error, as well as that in quoting from the English decision, is the result of inadvertence and not prompted by any desire to mislead the court or others who may read defendant's brief.

From the fact that defendant's counsel has cited no authorities throwing any real light upon the constitutionality of the law in question, we are led to conclude that he fully realizes the weakness of the contention that chapter 239, Laws 1911, is unconstitutional, and therefore bases his real defense, not upon the ground that the action of defendant in refusing to issue the warrant was justified, but that such action, right or wrong, is final, and cannot be reviewed by this court, owing to the interest of the judges thereof. Having held, however, that such action of defendant is not final, and that it is both our right and duty to act in this matter, we shall proceed to consider and determine the ultimate question before us—the constitutionality of such law. We do this in the full faith that the people of this state will believe that the conclusion at which we arrive will be the honest view of those whom they have placed in a position of great trust; and we believe that they, who have so honored us, will commend us for meeeting squarely the issue thus presented, while they would justly condemn us, if moved by the insinuations and veiled threats contained in defendant's brief, we should refuse to uphold the dignity of this court and wrongfully surrender to an inferior executive officer the judicial function of interpreting the laws of this state.

It being a fundamental proposition that the state Constitutions do not *grant* powers to the representatives of the people, but that such representatives *have* every power of a sovereign people, except such as may be taken from them by the state Constitution or given to the federal government by the federal Constitution, it follows that the universal rule for construing the enactments of such representatives is: An act of a state legislature will not be held unconstitutional unless its unconstitutionality appears practically beyond a reasonable doubt. This rule has frequently been announced by this court. We are, however, not content to base our decision herein upon such rule, but, owing to our direct interest therein, we believe that we should refuse to issue the writ prayed for, unless it appear clear that, under both reason and authority, the law in question is constitutional.

It must be conceded by all that our Constitution forbids any increase in the salary of any officer named in the sections quoted, through the granting to him of "any compensation, perquisite or emoluments for or on account of his office"; but it must be presumed that our Constitution was drafted with the utmost care and precision in the use of language, and with a full understanding of the accepted meaning of every word used therein. With this thought in mind it might be sufficient, for the purposes of this decision, to note that an allowance for "expenses" is not forbidden by any section of the Constitution. The distinction between the term "expenses" and the phrases "compensation, perquisite or emoluments for or on account of an office," or, "for the performance of duties connected with an office," is so broad and clear that it cannot be presumed that the framers of the Constitution overlooked the same. The Constitution nowhere forbids the allowance, to any public officer, of expenses incident to the performance of his official duties. The convention which framed the Constitution of this state had before it all of the Constitutions that had theretofore been adopted by the several states as well as the Constitution of the United States; and such convention had among its members many of the most prominent lawyers of the territory—men who must be presumed to have been familiar with the decisions of the various courts interpreting the language of such Constitutions and the constructions placed upon the legislative enactments of the various states. These men must have known that section 1, art. 2, of the federal Constitution, declared that the *President* should receive for his services a compensation "which shall neither be increased or diminished during the period for which he shall have been elected, and he shall not receive within that period any other *emolument* from the United States or any of them." These men must have known that the word "emolument" was, as recognized by every authority, a term broad and comprehensive, one which includes within it "perquisites," "salary," "compensation," "pay," "wages," and "fees." These men must have known that, with the above provisions of the federal Constitution in force, the Congress of the United States, a body of men which at all times during the history of this government has had among its members many of the greatest constitutional lawyers of the day, had

enacted legislation under which the President, *for nearly a century prior to the framing of our Constitution,* had been furnished a home, horses, carriages, servants, household equipment, and many other things incidental to and appropriate to his high office. These men must have known that such federal legislation had never been questioned either as regards its propriety or its constitutionality.  These men must have known that in practically every state in the Union (in many of which there were constitutional provisions similar to the one above referred to in the federal Constitution and to the ones relied upon by defendant in this case) there had been legislative enactments making provisions for the several Governors similar to those made by the federal Congress for the President, as well as innumerable measures appropriating money to be paid other officers to recompense them for expenses incurred in the discharge of their official duties.  Is it possible for any one to presume that these men, with all these facts in mind, intended, by the words used in our Constitution, to prohibit allowances for expenses incident to the discharge of public duties?  Further light has since been thrown upon the construction given to the provision of the federal Constitution above referred to by the act of June 23, 1906 (34 Statutes at Large, 454, c. 3523 [U. S. Comp. St. 1913, § 225]), which provides:

"That hereafter there may be expended for or on account of the *traveling expenses* of the President of the United States such sums as Congress may from time to time appropriate, not exceeding $25,000 per annum, such sum when appropriated *to be expended in the discretion of the President and accounted for on his certificate solely.*"

Under appropriations thereafter made by Congress, Presidents' Roosevelt and Taft received, and today President Wilson is receiving, thousands of dollars each year.  So far as we know, it has never been suggested that the money so allowed was an "emolument," and therefore unconstitutional.  No one has ever seen fit to accuse these Presidents of being grafters.  The judges of the federal courts, whose salaries are fixed by a law declaring that such salaries shall be the "compensation for their official services," draw from the United States Treasury a sum not exceeding $10 per day when absent from the places of their resi-

dence.   Act March 3, 1911, c. 231, § 259, 36 St. L. 1161 (U. S.
Comp. St. 1913, § 1236).   This allowance is not given as an in-
crease of *salary* but to cover the expenses incident to their being
away from home in the discharge of their duties.

Certainly, from the above, it should be clear that it is uni-
versally held that an allowance for expenses incident to the dis-
charge of the duties of office is not an increase of salary, a per-
quisite, nor an emolument of office.   Counsel for defendant prac-
tically concedes as much, because in his brief he says:

"If the act of the Legislature had merely provided that you
should be reimbursed on account of actual traveling fees or
other money which you expend for the state, other than your
actual living, this would probably be valid; but such is not the
case."

This brings us to a discussion of what we deem the only
question upon the real merits of this case—the allowance of a
lump sum instead of an appropriation to reimburse for actual
moneys expended and itemized.   The Constitution of this state,
as well as the Constitutions of nearly all the other states, con-
tains no provision requiring the judges of the appellate court to
reside at the capital.   In many states the judges do not reside
at the capital; in one at least they are required to reside in the
district from which elected.   The territorial Supreme Court of
Dakota territory was composed of the several district judges who
held stated terms of appellate court at the capital, and were en-
gaged at other times in the trial of cases in the several districts.
The framers of our Constitution knew of these facts and un-
doubtedly intentionally so worded the Constitution as to allow
the judges of this court to retain their actual, as they expressly
allowed them to retain their legal, residences at their former
homes.   The Constitution merely requires that they hold two
terms of court at the capital.   It would therefore be entirely
proper and legal for plaintiff to have retained his actual resi-
dence at Aberdeen, the place of his legal residence, just as
many of the judges in other states live away from the capital.
If the judges of this court continued to reside at the places of
their legal residence, no question, under any authority, could
be raised as to the constitutionality of a law which appropriated
money to reimburse them for the actual expenses incident to their

travel to and from, and for their hotel bills while at, the capital. Such an allowance would leave to the judges clear, as compensation for their official services, the salary provided by law, and no one could, and we apprehend no one would, say that they received perquisites or emoluments. .In view of the number of trips that would have to be made to the capital and the number of days that would have to be spent there, it is clear that the aggregate of such expenses would be in excess of $600 per year for each judge so living away from the capital. Let us suppose that the several judges of this court were living at the places of their legal residence, and the Legislature were asked to enact legislation to reimburse them for their actual expenses incurred in going to and remaining at the capital, which expenses could, from their nature, be itemized. Is it possible that such Legislature could not say to the judges of this court:

"We believe that, owing to the fact that the duties of your office require your presence at the capital a considerable portion of the time, you can better discharge the duties of such office if you will reside at the capital; hence, in the furtherance of a sound public policy, we ask you to make your actual residence at the capital, and, in order that you may do so without financial loss to you, we will, in place of paying your expenses of traveling to and boarding at the capital, while living at your places of legal residence, allow you such a sum as will cover the extra expense incident to your moving to and living at the capital."

Would not the allowance in the one case be as much an allowance for expenses, and in no sense a perquisite or emolument, as in the other? Certainly it would; the only difference being that in the one case the law could provide for the expenses to be itemized and the exact amount paid, while in the other, from the very nature of things, it would be necessary for the Legislature to estimate the reasonable and probable amount of such expenses and appropriate a lump sum therefor. If the Legislature could pass such a law to encourage the judges to move to the capital, for the same reasons it certainly could pass one where, prior thereto, the judges had voluntarily moved to the capital. This they did, and no one has ever claimed that the allowance made was greater than the amount of such expenses, or that it is greater than would be the expense incident to the judges coming

to and remaining at the capital in the discharge of official duties if they lived at the places of their legal residences. The one allowance is just as clearly for expenses as would be the other, and is therefore as clearly permissible under the Constitution as the other. The Legislature had the right, if deemed best as a matter of public policy, to enact the law which it did enact, provided it did not make the allowance greater than the expenses it was designed to cover; and it was for such Legislature to determine a reasonable and proper amount. It is clear that the Legislature did not intend, in the enactment of such legislation, to *increase* the *salaries* of the judges, or to grant them any *perquisites* or *emoluments* for the discharge of their duties, but only intended to assure them, in so far as possible, that for the performance of their official duties alone, and not for the performance of such duties and the payment of the expenses incident thereto, they should receive the salaries provided by law for the performance of such duties. The Legislature had a right, in determining the advisability of this legislation, to take into account what would have been the probable allowance necessary to meet the expenses for which the judges would have been justly entitled to be reimbursed, if they had remained at their legal residences, and also to take into account the estimated amount of additional expense incident to moving to and living at the capital; so long as it has not exceeded either of these sums, there is left no ground to claim that it has increased their salaries. The mere fact that the Legislature, in the exercise of its discretion, has seen fit to estimate, in advance, the amount of such expenses, and to limit the same to the sum of $50 per month, does not transform the expense allowance into an increase of salary. The only purpose of the act was to enable the judges to retain for their own proper use, and for the support of their families, the salaries allowed them for their official services, instead of paying out such salaries for expenses that should properly be paid by the state.

A careful and, we believe, exhaustive examination of the decisions fails to disclose a single case in which it has ever been held that a legislative act, providing for an allowance, for expenses incurred in the discharge of official duties, to a public officer, whose salary or compensation was fixed at a stated sum, was in violation of provisions such as are found in many state

Constitutions, forbidding an increase of salary during official terms, or forbidding the granting of "fees," "perquisites," or "emoluments" to such officer. Legislative acts which directly in terms, or as construed, attempted to increase such salaries, have been held invalid. But no decision has been found or, as we believe, can be found, which holds a legislative act to be unconstitutional which merely relieves an officer, who received a fixed salary or compensation, from expending such salary for expenses incident to the performance of his official duties. One question will be found running through all the decisions wherein the courts have passed upon the validity of statutes providing allowances to public officers, to-wit: Was the purpose of the Legislature to increase the salary, or was its purpose merely to save such salary, so that the officer would, in fact, receive the whole thereof, for the performance of his official duties? Defendant's counsel, in his printed brief, says of the expense allowance given by the Legislature to the members of this court:

"The reason it is given is on account of the pitiable salary which is attached to your office. It is because members of the Legislature realized this that they attempted to give you this."

Undoubtedly the Legislature intended to permit the members of this court to retain and use, for the support of themselves and their families, the meager salaries attached to such office, instead of requiring them to expend it in traveling and other expenses. Not even the defendant claims that the Legislature, has done more than this.

The following cases illustrate the rule applicable to legislative acts relating to expense allowances:

The Constitution of the state of Wisconsin declared that the compensation of a public officer should not be increased or diminished during his term of office. Section 26, art. 4, Constitution Wis. An act of the Legislature of that state fixed the salary of circuit court judges, and provided that:

"The judges of the circuit courts (shall receive) $3,600 each, and in addition thereto each judge shall receive the sum of $400 per annum as and for his necessary expenses while in the discharge of his duties, such amount to be paid quarterly." St. 1898, § 170.

The Supreme Court held that this expense allowance was not

a part of the salary or compensation of the judges, within the provision of their Constitution forbidding an increase of the compensation of a public officer during his term of office. Milwaukee Co. v. Halsey, 149 Wis. 82, 136 N. W. 139.

The Constitution of California (section 9, art. 11) forbade an increase of the salary or compensation of any officer during his term of office. The Supreme Court of that state, in Kirkwood v. Soto, 87 Cal. 394, 25 Pac. 488, held that the constitutional inhibition applied only to the salary, and not to incidental expenses of the office. The court, in its opinion, says:

"The words 'compensation' and 'salary' were evidently used synonymously in the Constitution and in the county government act"

—and referred to the fact that the Constitution forbade an increase of the compensation of state or constitutional officers equally with county officers. The action before the court was to recover expenses of a county superintendent. The court said:

"Since the adoption of the present Constitution, many acts have been passed by the Legislature, after the commencement of terms of office, providing for the payment of necessary expenses incident to the offices."

The Legislature of that state had passed an act making an allowance to the justices of the Supreme Court and the judges of the superior courts, for expenses incurred in going to and from their respective places of residence, upon the business of the court, or to attend its sessions. Referring to this act, the court says:

"The constitutionality of these provisions has never been questioned, so far as we are advised, in any court, or elsewhere, and yet, if the theory of the appellant be true, they would seem to have been subject to the same objections raised here, during the terms of the justices and judges who were in office at the time the act was passed. The question now presented for decision does not appear to have been ever passed upon by the Supreme Court of this state, but a similar question was before the Supreme Court of Illinois in Briscoe v. Clark Co., 95 Ill. 309. The Constitution of that state provided that the county board should fix the compensation of all county officers, with the amount of their necessary expenses, 'provided that the compensation of no

officer shall be increased or diminished during his term of office.' The Supreme Court held that it was the salary of the county officer (*the compensation for the personal discharge of official duty*) which the board was forbidden to change, * * *" and not the expense allowance, saying: "In our opinion, it was the compensation for services to be rendered, and not the incidental expenses of the office, that the Legislature was forbidden by section 9, art. 11, of the Constitution, to raise."

A review of decisions founded upon particular statutory provisions would extend this opinion to no useful purpose. It is sufficient to say that we have no doubt or hesitation as to our conclusions: (1) That it is not only the right but the duty of the judges of this court, not only under the rule of necessity, recognized by all the courts, but especially under the express provisions of our state Constitution, to take jurisdiction of and to decide this case regardless of any personal interest in the result thereof. (2) That chapter 239, Laws 1911, being what it clearly purports to be, a law providing for the expense incident to the office of supreme judge, and therefore one which was intended to save to the judges their salaries, and not to increase such salaries, is constitutional. (3) That the voucher presented to and filed with the defendant on May 4, 1915, and upon which plaintiff based his demand for the expense warrant claimed, was and is in due and proper form. (4) That it was the clear and plain duty of the defendant to issue the warrant demanded by the plaintiff. (5) That the proper and only adequate remedy to enforce the performance of this ministerial act is the writ demanded by plaintiff.

Let judgment be entered accordingly.

McCOY, P. J., taking no part herein.