# STATE OF NORTH DAKOTA v. GEORGE L. NELSON and A. M. Baker.

### (150 N. W. 267.)

Section 174 of the Constitution of North Dakota prohibits the expenditure of more than 4 mills on the dollar of the assessed valuation of property within

the state. The legislature of 1913 made appropriations which if allowed *in toto*, would exceed this limit. The state board of equalization scaled such appropriations to make the same lawful. Thereupon the educational institutions brought mandamus in the supreme court to compel the payment to them of their full share. Pending such hearing the defendant Nelson published an editorial wherein it was alleged that the supreme court and the members of the board of equalization had entered into a conspiracy to render a fake decision before election to influence the re-election of the governor of this state, and to reverse its decision after election.

**Mandamus — supreme court — proceedings — when pending — contempt of court — publication of slanderous article — pending litigation.**

1. The mandamus proceedings originated in this court, and will be considered pending until this court has lost power to change or modify its decision. The mandamus proceedings reviewed, and *held*, that the same was pending until the 19th of November, 1914, while the article in question was published November 13, 1914. The publication in question was calculated to prejudice the rights of the litigants, and to prevent a fair and impartial hearing in this court, and is therefore contempt of court.

**Rights of litigants — of public — reason for punishment — courts — free speech — publication — truth of article — opportunity to show — silence of accused — effect.**

2. The reason for punishing such contempts is that said publications interfere with the rights of the litigants and of the public. Litigants are entitled to have their controversy settled without interference with, or intimidation of, the court itself. The right of free speech is sacred, but at times must give way to other rights even more sacred. The right of free speech will not protect a man in invading a church and haranguing the audience during religious services, nor will it protect him in disturbing social or political gatherings. Neither will it protect him in interfering with the orderly conduct of courts of justice. Free speech does not give the right to vilify and scandalize. It is as much a crime to assert charges which one knows to be untrue as it is to remain silent if the same are believed to be true. When given an opportunity to prove the truth of the article in question, the defendant Nelson refused to give any reason, weak or strong, why he believed such article to be true. This, in effect, is an admission that the same was untrue.

**Explanation by accused — declining to give — privileged communication.**

3. In considering punishment this court wished to consider the provocation or other excuses of the defendant, but was prevented in this case by the conduct of the defendant, who stated: "I decline to state from what source or authority or information I obtained the facts or inference leading me to believe the same to be true, for the reason that it was a privileged communication." This does not meet the burden of proof required of him to show the truth of the charges made, and is an admission, in effect, of the falsity of the article.

The punishment is, however, limited to a small part of that which might be inflicted. Defendant Nelson is found guilty and imprisoned for ten days and fined $200.

**Statement of accused — writing article — lack of knowledge of same — publication — preventing same.**

4. The defendant Baker states under oath that he did not write the article in question, did not know it was being written; and could not have prevented its publication had he known. Although the circumstances throw much doubt upon these assertions, the court has neither the time nor the inclination to continue the inquiry, and Mr. Baker will not be punished

Opinion filed December 29, 1914.

*Andrew Miller*, Attorney General of the State of North Dakota, for plaintiff.

*L. N. Miller* and *F. O. Hellstrom*, for defendants.

Burke, J. Section 174 of the Constitution of North Dakota limits the amount which may be yearly expended by the state to 4 mills on the dollar of the assessed valuation of all taxable property in the state. The legislature of 1913 made certain appropriations for the educational institutions, wolf bounty, bovine tuberculosis, glandered horses, terminal elevators, and agricultural training schools, which apparently exceeded the possible income leviable under this constitutional limit. The state board of equalization refused to levy the full amount of such appropriations, but scaled the same to come within the constitutional limit aforesaid. Hearing was had October 22, 1914, on the question, among others, of whether the state tax levy as made and apportioned by the state board of equalization, and which reduced the educational institutional tax levy below $1\frac{1}{8}$ mills was valid, and, if so, was justifiable as necessary, when the state's total possible income from taxation and from all other sources was apportioned to its total disbursements authorized by specific appropriations, and its auditor's estimate of all other necessary and legal expense as authorized by various statutes. This court, not being conversant with the figures, appointed a referee before whom testimony might be taken to establish the exact amounts. Such referee called as a witness the state auditor, and requested him to furnish such estimates. In compliance therewith, the auditor fur-

nished an estimate covering many pages of items, and showing that the general expense of running the state, together with the appropriations in dispute, were well within the constitutional limit of 4 mills on the dollar. Based upon this estimate, this court handed down its decision on the 28th of October, 1914, holding with the educational institutions. Thereafter, on the 5th of November, 1914, the board of equalization made application for a rehearing, alleging that, owing to the haste with which the estimate had been prepared, items aggregating the sum of $300,000 had been omitted from the estimate, and that in truth and fact the appropriations demanded were in violation of the Constitution as aforesaid, and in excess of the limit. Upon this showing, a rehearing was granted; the state auditor was recalled, and allowed to supplement the estimate already furnished by additional evidence of items which proved conclusively that the appropriations mentioned if allowed *in toto* were in violation of the Constitution of this state, and could not be paid. An opinion on rehearing was accordingly filed to that effect on November 12, 1914. See State ex rel. Lenhart v. Hanna, 28 N. D. 583, 149 N. W. 573. The same day application was made to this court for a still further hearing, which was granted, and upon the following day, November 13, 1914, the court held such hearing, and the educational institutions and the board of equalization appeared by their attorneys, and still further argued the case. Thereafter the case was further considered by this court until the 19th of November, 1914, when a final determination was had, and an order entered refusing to modify the opinion on rehearing.

The Co-operators' Herald is published at Fargo, North Dakota, and owned by a corporation, the entire stock of which we are advised is owned by five persons, of whom the defendants Baker and Nelson constitute two. They claim between 5,000 and 6,000 circulation. A. M. Baker is the manager, and George L. Nelson the editor, of such publication. In the issue for November 13, 1914, in a double column article, in a conspicuous place on the first page, is an editorial signed by George L. Nelson, entitled:

Levy Decision, Gauzy Frame-up. The Foxy Boss and Henchmen Pull Off Lovely Frame-up Stunt and Bamboozle Voters.

It has been persistently whispered that the supreme court hearing

and opinion on the tax levy case was purely a frame-up to appease the state educational institutions of the state, and ward off a real hearing on the merits of the case until after election. We heard this rumor, but could give it no credence, and gave it no publicity before election, because we could not believe that the highest tribunal of the state could be inveigled into a conspiracy of such a character. We feel at perfect liberty to say that at no time had we a very exalted opinion of the personnel of that body, but we could not bring ourselves to believe that its members would besmirch their high office by resorting to the tricks of ordinary machine politics, and dirty politics at that, in order to save the political scalp of the "foxy boss."

Apparently the whole reactionary bunch, governor, attorney general, auditor, deputy auditor, treasurer, et al., not forgetting the members of the board of equalization and supreme bench, were in the plot to hold a fake hearing before election, and appease the heads of the educational institutions with a favorable opinion, in order to hold them in line, with the secret understanding that the board of equalization would demand a rehearing after election, and that it would be granted and the ways all greased for the supreme court to be able to gracefully reverse itself and knock the educational institutions out. . . . It is a foregone conclusion that the supreme court will reverse itself, in fact it may have done so before this issue reaches our readers.

On the 18th of November, 1914, the attorney general of the state laid information against A. M. Baker, business manager, and George L. Nelson, editor, charging them with contempt. After citation and plea of not guilty, the defendants filed an answer wherein it was stated: "The contention of defendants is that at the time of the publication of the alleged contemptuous article as set forth in the information, and admitted in the information to have been published on the 13th of November, A. D. 1914, was published after a final and complete determination of the controversy to which the article referred."

(1) Thus the first and principal controversy is whether or not the case of State ex rel. Lenhart v. Hanna was pending in this court at the time of the publication of the article aforesaid. As already stated, an opinion had been filed October 28, 1914, and an opinion on rehearing on November 12, 1914, both prior to the publication aforesaid, but

being an original proceeding in this court there could be no remittitur to a lower court, and the subject-matter remained under our jurisdiction. Immediately upon the filing of the opinion upon rehearing, November 12, 1914, application was made upon behalf of the board of equalization for a still further hearing, which was granted, and upon the 13th day of November, 1914, this court sat in public session all day, listening to arguments by both parties and their attorneys. This session was attended by a great many people, approximately fifty, and lasted until about the time the newspaper in question went to press. Upon the following and several succeeding days, this court discussed the matter in chambers, and finally, on the 19th of November, 1914, an order was entered, declining to make any further modification in the opinion. During all of those days this court could, had it so desired, have withdrawn its original opinion and the opinion on rehearing, and have modified or entirely changed the same. It is thus manifest that the article in question was published while the case was under consideration by this court. In fact, the language of the article itself shows this to be the case, for it is therein stated that "it is a foregone conclusion that the supreme court will reverse itself, in fact, it may have done so before this issue reaches our readers." That courts have the power to protect themselves against this kind of interference is apparent to anyone who gives the matter the slightest thought, and such has been the holding of all the authorities which we have been able to find. At 9 Cyc. page 20 (L), it is said: "Publications concerning a pending cause, trial, or judicial investigation, calculated to prejudice or prevent fair and impartial action, which seek to influence judicial action by threats or other form of intimidation, which reflect upon the court, counsel, parties, or witnesses respecting the cause, or which tend to corrupt or embarrass the due administration of justice, constitute contempt." In support of this text there are cited in the main volume of Cyc., together with the 1913 permanent Annotations and the 1914 Annotations, approximately one hundred cases, covering most of the states of the Union, the Supreme Court of the United States, England, and Canada. We have found no citations to the contrary. In the light of this holding it is unnecessary to determine whether or not the article in question would have constituted contempt of court had it been published after a final determination of the said case.

It will be time enough to determine such proposition when it is reached.

(2) The reason for punishment of contempt of court is that such acts tend to obstruct the administration of justice. From the earliest days such ruling has been enforced. In Reg. v. Wilkinson, 41 U. C. Q. B. 47, it is said: "The object of preventing, and, if necessary, of punishing, publications calculated to affect prejudicially the interest of suitors, is that there may be a fair trial; that the stream of justice shall be allowed to flow unruffled by extraneous influences." And in Rex v. Parke, [1903] 2 K. B. 432, it is said: "The reason why the publications of articles like those with which we have to deal is treated as a contempt of court is because their tendency, and sometimes their object, is to deprive the court of the power of doing that which is the end for which it exists,—namely, to administer justice duly, impartially, and with reference solely to the facts judicially brought before it: Their tendency is to reduce the court, which has to try the case, to impotence." And in Fellman v. Mercantile F. & M. Ins. Co. 116 La. 723, 41 So. 49, it is said: "There is an obvious reason which appeals to the common sense of mankind, why outside influences should not be allowed to interfere with the conduct and decision of a cause or with the execution of a judgment, and that is that every individual, whether he be prosecuted criminally or be a litigant in a civil action, is guaranteed by the fundamental law a trial according to law, and protection by and under the law, for life, liberty, and property; and he is denied those rights, just as certainly as one who is hanged by a mob is denied them, if every interested, meddlesome, or malicious person who may choose to do so is allowed to intimidate his witnesses, corruptly influence the jurors to whom his case is submitted, denounce the judge for his rulings as the trial progresses, and obstruct the execution of judgment when obtained." See also Globe Newspaper Co. v. Com. 188 Mass. 449, 74 N. E. 682, 3 Ann. Cas. 761; Lord v. County Comrs. 105 Me. 556, 75 Atl. 126, 18 Ann. Cas. 665,—interesting footnotes being given in each of the annotated cases.

Applying such law to the facts at hand, we find two litigants, the board of equalization of the state of North Dakota upon one side, and the educational institutions upon the other, contending in this court for a statutory construction under the Constitution of this state, both

29 N. D.—11.

sides admitting that no more than 4 mills upon the dollar of the assessed valuation of the state may be spent, and one contending that a certain appropriation made by the last legislature was a violation of the provisions of this Constitution, and the other insisting that such money may be spent without such violation. This court did not seek this litigation, and only responded when the parties appeared in court demanding their legal rights. The parties to this controversy, as well as the taxpayers of the state at large, are entitled to have this question decided by the supreme court without any interruption or intimidation by any person whomsoever. While in the midst of the deliberation, under the guise of the sacred right of free speech, a newspaper editor sends broadcast over the state an accusation that the members of this court had entered into a criminal conspiracy with the governor of the state, the state auditor, the state treasurer, the attorney general, and the commissioner of agriculture and labor, to render a mock decision therein, and that this conspiracy had for its object the re-election of the governor of this state. Such a charge certainly tends to embarrass the court in its decision. If the decision finally be in favor of the board of equalization, it will allow the same editor to point to the fact as corroboration of his claim that such conspiracy had existed, while if the decision be in favor of the State University, well might the charge be made that the court had been intimidated by the charge made against it. The wrong done by the publication of the article is not so much against the court or the members thereof as against the litigants, against the taxpayers, and against the sacred foundations of justice, upon which the liberties and lives of all citizens rest.

Much has been said of the sacred rights of free speech. It is always conceded that the right is sacred, but at times such sacred right must give way to others even more sacred. It has never been claimed that it will protect a man in invading a church and interrupting the sermon with his free speech. The free right of speech will not protect a man in obstructing the streets of a crowded city; the free right of speech may not be used to interrupt even social gatherings or political meetings. Should it, then, be allowed to interrupt the courts of justice? Surely there must come a time when the rights of the free speaker are overshadowed by the rights of other men to unhampered justice. The right of free speech and the freedom of the press are as sacred to the

members of this court as they are to the defendant, and, we dare say, will be longer upheld by them than by him; but such rights must not be considered unbridled license to vilify and scandalize. It is as much a crime to assert charges which one knows to be untrue as it is to remain silent if he believes some offense to have been committed. When given an opportunity to prove the truth of the article which he had published, the defendant Nelson remained silent. When asked to state any reason, weak or strong, why he had even believed such article to be true, he replies that he must not tell because to do so would violate a confidential relation. In this he merely imitates the thief who, caught with the goods upon him. insists that he has just purchased them from "a tall, light-complexioned stranger."

(3) We come, now, to the question of punishment. The defendant Nelson in answering the interrogatories assumed the whole responsibility for the publication of the article aforesaid. When asked to state any reason why he had published the same, or any circumstances which had caused him to believe the same to be true, he replies: "I decline to state from what source or authority or information I obtained the facts or inference leading me to believe the same to be true, for the reason that it was a privileged communication, and for the further reason that if I divulged the source from which I received the information it would be a gross breach of professional ethics."

In determining the punishment we would like to consider the provocation which induced the same, but in doing this we are completely obstructed by the defendant himself. The burden of proof was upon the defendant to show the truth of the allegations alleged by him. This he positively refused to attempt, thereby, in effect at least, admitting their falsity. This is, of course, a serious offense, but we are inclined to leave his true punishment to his conscience and an enlightened public opinion. We do not believe the offense will be repeated. Therefore we will impose but a slight portion of the punishment which might be inflicted. It is the judgment of this court that George L. Nelson be confined in the Burleigh county jail for a period of ten days commencing at noon, November 23, 1914, and that he pay a fine of $200; and that in case such fine is not paid, he be confined in said jail for an additional period of twenty days.

(4) The case of the defendant Baker is different. He states under

oath that he did not write the article in question, did not know it was being written, and could not have prevented it had he known, and was in no manner responsible for its publication. Although the circumstances throw much doubt upon these assertions, and it seems improbable that the business manager of the paper did not read the same before it went finally to press, yet we have neither the time nor the inclination to continue the inquiry. Mr. Baker was one of the owners of the paper, and as such could probably be held upon this charge. See State Bd. of Law Examiners v. Hart, 104 Minn. 88, 17 L.R.A.(N.S.) 585, 116 N. W. 212, 15 Ann. Cas. 197; McDougall v. Sheridan, 23 Idaho, 191, 128 Pac. 954. Also see an interesting discussion in State ex rel. Crow v. Shepherd, 177 Mo. 205, 99 Am. St. Rep. 624, 76 S. W. 79. Certainly after the knowledge gained from this trial, neither Baker nor the other owners of the paper will be able to excuse themselves upon this ground, should a similar offense be committed in the future.