## STATE v. KIRBY.

### In re KIRBY.

### (154 N. W. 284.)

(File No. 3862.    Opinion filed October 8, 1915.)

1. .Contempt—Attorney's    Authorized    Published    Interview—Free Speech—Pending Disbarment Proceeding, Imputation as to Court's    Prospective    Decision    Therein—Acts    Constituting Contempt—Impeding    Administration    of    Justice—Duty    of Courts as to Punishment For.

While courts should exercise the greatest care not to infringe upon the right of free speech, guaranteed by Art. 6, Sec. 5, Constitution, and while it is not every abuse of that right, even when directed toward courts or judges, that should be held to be contempt of court, yet, whenever such abuse directly tends to impede, embarrass, or obstruct courts in the administration of justice, such courts are ordinarily remiss in their duty to, and invite the just contempt and critcism of, the general public, whose servants and protectors they are supposed to be, if they overlook the same and allow it to go unpunished; and held, that an attorney of 24 years' standing in this state, who authorized publication in newspapers of an interview, in which he predicted that the Supreme Court would not disbar another attorney who was then a candidate for Governor, for the reason that such candidate "proposes to use every argument within his command, in the coming campaign for the governorship, and that if pressed to it, he will bear down upon the fact that the Supreme Court * * * saw fit to decide against" the State Auditor in a recent decision wherein the constitutionality of a statute providing for the payment of expense money to the Justices of the Supreme Court was upheld, was guilty of contempt of court; it appearing further from the evidence, that in the conversation between him and the newspaper reporter no mention was made by him as to any other reason why said other attorney would not be disbarred than the desire of the Court that such attorney should not use the decision of said Court in the case in which the Auditor was a party, in the coming campaign.

2. Contempt—Punishment For—Publisher of Statements, and At-

torney Authorizing Publication—Relative Fines—Attorney's Responsibility—Statute—Professional Ethics.

In considering the degree of punishment for contempt of court, in a proceeding involving publication of a statement in a newspaper, which was held to be a contempt of Court, and in imposing a higher fine against a defendant who was an attorney, and who made and authorized the publication of the statement, than had previously been imposed against the corporation proprietor of the newspaper whose reporter had received such statement for publication, the Supreme Court will take into consideration the fact that the attorney who thus authorized the publication was one of the most widely known attorneys of the state, and one whom such corporation had a right to presume knew what could be lawfully published; that such attorney must be presumed to have been familiar with Pol. Code, 697, imposing upon an attorney the duty of maintaining "the respect due to the courts of justice and judicial officers"; that his official oath required him to act as an attorney "with all good fidelity  *   *   * to the court"; that he doubtless was familiar with the Code of Professional Ethics adopted by the American Bar Association and ratified by the State Bar Association of this state, and with the "oath of admission" proposed in such Code, with which his conduct, in making such statement, conflicted; and that he was not the mere instrument through which said publication reached the people, but was he who gave it birth.

3.    Contempt—Intent, as Defense—Presumption—Rule of Law.

In a proceeding for contempt for authorizing publication of statements concerning the Supreme Court which tended to impede and obstruct the administration of justice, held, it was no defense that defendant did not intend, by anything he said to the newspaper reporter, to reflect upon the integrity of the Court, or to embarrass it in the discharge of its duties; since the rule of law is, that he is presumed to intend the natural results of his own acts.

4.    Attorneys—Disbarment, Involving Contempt—Civil Proceeding.

A proceeding in disbarment, although the misconduct complained of may constitute contempt of court, is purely civil in nature.

5.    Attorneys—Disbarment, Grounds of—Misapprehension by Attorney of Duty to Public—Mental Illusion as Exculpatory Explanation of Misconduct.

In a proceeding for disbarment of an attorney, held, that, where an attorney of 24 years' standing, who authorized publication of an interview in which he predicted that the Supreme Court would not disbar another attorney who was then a can-

didate for Governor, for the reason that such candidate "proposes to use every argument within his command, in the coming compaign   *   *   *,   and that if pressed to it, he will bear down upon the fact that the Supreme Court   *   *   *   saw fit to decide against" the State Auditor in a recent decision wherein the constitutionality of a statute providing for payment of expense money to the Justices of the Supreme Court was upheld, and where the Court, in determining whether the attorney's conduct merited disbarment, took into consideration the fact that he had also, in a brief filed in said Court in the proceeding to which the Auditor was party, by inference and in effect charged the members of the Court with being grafters, and purloiners of the state's treasury, with knowing the state Constitution, and with failing to heed the same, and thus meriting the brand of traitors, and who in the brief drew attention, in that connection, to the biblical phrase popularly known as "the handwriting on the wall," and who subsequently published in pamphlet form and distributed the decision in the proceeding in which the brief was filed, with criticism thereof in footnotes, it being evident, from statements therein, that the pamphlets were intended for general distributon, it being stated therein that said notes were written "with the hope that   *   *   * it will awaken a disapproval among the people of our state and particularly among the members of my profession"; **held,** that such published statement and such other acts do not constitute such misconduct as to justify disbarment, since the Court finds therein that which, to the minds of the members thereof, furnishes conclusive explanation of the misconduct in question, to the effect that defendant's mind is so engulfed in the thought that he has a great duty to perform—"to awake a disapproval" of said decision—that the clear light of reason, that usually directs his mind, is unable to enter therein, leaving him as one suffering an illusion; the Court being unable to explain his conduct upon any other theory; it further appearing that, with the one other exception involved in his actions in and in connection with said other proceedings, he has always maintained, toward all courts, the respect and courtesy due courts from attorneys and has not before sought to weaken or destroy public confidence in the courts; and the Court believing that, in all else, save perhaps that one matter in respect to which he seems suffering an illusion, he will hereafter act toward the Supreme Court with due respect.

Two original proceedings by the State against Joe Kirby; one charging contempt of court, the other seeking disbarment, tried together by consent. Defendant adjudged guilty of contempt; disbarment proceedings dismissed.

*C. C. Caldwell,* Attorney General, for the State.
*Joe Kirby,* in pro. per.

WHITING, J.   Based upon one alleged wrongful act, the
two above-entitled matters were brought before this court; the
one charging the defendant with being guilty of contempt of this
court, the other charging him with dishonorable and unprofes-
sional conduct as an attorney and counselor at law.   Both pro-
ceedings were, by mutual consent, heard at one and the same time.
The charges against the defendant and respondent (hereinafter
known as defendant) were, in substance, that:   He had, during
all the times mentioned, been and now was a regularly licensed
and practicing attorney of this state.   The Daily Capital Journal
was a newspaper published in Pierre, S. D., having a general cir-
culation in the vicinity of Pierre and throughout the state, and, at
the times mentioned, one Kingsbury was the duly authorized and
empowered reporter for said newspaper, authorized as such to
collect and publish news.   In the issue of said paper published on
July 9, 1915, the said Kingsbury (being authorized so to do by
defendant) caused to be printed, published, and circulated the
following article:

"Joe Kirby Says Egan Will Stay.

"Joe Kirby, the Sioux Falls attorney, who recently presented
to the Supreme Court of the state of South Dakota, the argument
for State Auditor Handlin, in the case of Judge McCoy against
the auditor in the matter of the payment of expense vouchers, was
in Pierre for a few moments yesterday and in conversation with
a reporter for the Capital Journal, Mr. Kirby became prophetic.

" 'The Supreme Court of South Dakota will not disbar G.
W. Egan of Sioux Falls, from the legal bar of the state of South
Dakota, upon the complaints used by the Attorney General of the
state in his recent charges against Egan,' said Kirby.   'Just paste
this prediction in your hat and see whether or not it is correct.'

"Pressed for reasons for this positive statement Mr. Kirby
said Egan proposes to use every argument within his command,
in the coming campaign for the governship, and that if pressed
to it, he will bear down upon the fact that the Supreme Court of
the state saw fit to decide against Mr. Handlin in that perquisites
case and that the Supreme Court and the Governor of the state,

consider the matter a closed incident, unless some candidate discusses it before the people.

"'Therefore, in order that Egan may not be impelled to say anything about it, the Supreme Court will not give serious consideration to the Attorney General's proposition to disbar Egan,' says Mr. Kirby."

On May 14, 1915, disbarment proceedings were commenced in this court against one George W. Egan. Said disbarment proceedings have at all times theerafter been pending before this court, as was, on July 8, 1915, well known to defendant. On July 8, 1915, at the said city of Pierre, defendant, well knowing that said Kingsbury was a reporter for said Daily Capital Journal, then and there gave and stated to said reporter the matters and things stated in the aforesaid published article, and authorized the said reporter to print and publish the same. Defendant, at the same time and place, made substantially the same statements to one Travis, another newspaper reporter, well knowing that said Travis was then and there a newspaper reporter. In the contempt proceedings it was also alleged that: Such article, so published as aforesaid, charges that this court will be influenced and governed by selfish and corrupt motives in the consideration of said disbarment proceedings against said Egan. The publication and circulation of such article, during the pendency of said proceedings against the said Egan and prior to the trial and decision thereof, have, from the nature thereof, a tendency to embarrass, impede, and interrupt the due administration of justice and the proceedings of the court in fairly and impartially trying the issues between the said Egan and his accusers.

Kingsbury testified in detail as to the conversation with defendant and to his taking notes of the same as the conversation progressed, and also swore that defendant authorized the publication of the interview. His testimony, in all respects, sustained the charges against defendant. His notes were received in evidence and were as follows:

"Joe Kirby home from visit to Black Hills. Supreme Court will not disbar Egan upon complaint based upon charges filed by Attorney General. Paste this in your hat. Because Egan in his campaign will use every argument to secure election and if driven to it will bear down on results in Handlin case. There-

fore keep Egan from alluding to it court will not consider Atty. Gen'ls proposition. "

The witness Travis testified that defendant stated to him in effect as follows:

"They certainly will go ahead and investigate, but it will be a whitewash; the court don't dare disbar Egan for if they do, he will take the stump in the next campaign on the $50. deal against the judges."

And he further testified that he did not recall anything further said in regard to that matter. He further testified, upon cross-examination, that, if defendant used the pronoun "they" in place of the words "the court," it was after the question, "What had the court done in the Egan matter?" The interviews with the two reporters were at the same place and one immediately following the other. There was absolutely nothing elicited, either upon the direct or cross examination of these two witnesses, from which it would appear that defendant had in mind any person, other than the members of this court, in speaking of what would happen in the Egan disbarment proceeding and of the reason for such happening.

Defendant, while admitting that he had conversations with said reporters at the time and place mentioned, swore that the conversations were not as alleged and as testified to by said reporters, and swore that when Kingsbury produced his notebook he specifically instructed him not to report such conversation, and that he made no notes. Defendant testified that he told Kingsbury:

"If George W. Egan was disbarred, then he would be absolutely foot-loose and he would use the decision in this salary deal, the Handlin case, and would use other matters in his possession that I believe he possesses, so that he could defeat any man affiliated with the party in power in the state of South Dakota, in his own district."

He then testified to statements he made to Kingsbury in regard to his views as to Egan's political aspirations; to how a certain reputed candidate for the office of Governor, aided by other members of a certain political party or organization, would, in order to further the political ambitions of such gubernatorial can-

didate and also placate Mr. Egan, assist Mr. Egan to gain the nomination for a certain office other than that of Governor, which other office defendant believed Mr. Egan desired to obtain; and as to how, in order that Mr. Egan's candidacy might not be injured by a judgment of disbarment against him, such gubernatorial candidate, aided by his coworkers, would see to it that, "when the Attorney General and prosecution want evidence, they would find that the evidence had evaporated, in other words, had disappeared," and that Mr. Egan would have "a clean bill of health or whitewash when they got through with it." Defendant testified that he did not consider this court "a part of that political party or organization that would do this whitewashing." He testified that, in the conversation with the reporters, he said nothing "at any time that reflected on the court"; that what he stated was "that the court wouldn't disbar him * * * for lack of evidence." Defendant, summarizing what he claimed to have told the reporters to be reasons why Egan would not be disbarred, stated that it was:

"That Egan could duck that (the McCoy v. Handlin Case, 35 S. D. 487, 153 N. W. 361) and other things and he would be let, would have to be let, in out of the cold; * * * that they (the political organization) wouldn't dare have a disbarred man on the ticket or the * * * would elect a man against him, * * * and when * * * spoke, the fellows down the line would have to fall in line, * * * and where is your court, without evidence."

Defendant testified that he thought then and now that the court would decide the Egan case according to the law and the evidence; that he said nothing to Kingsbury that could be construed as stating that this court would not dare disbar Egan. But defendant admitted, upon cross-examination, that, before he had seen a copy of the publication complained of, he asked the Attorney General what the article was, and the Attorney General stated to him the substance thereof, except that, instead of stating that the article said, "The court wouldn't disbar Egan," he said it stated, "Egan wouldn't be disbarred"; and he further admits that he told the Attorney General that, "Yes, I guess that's about right, except I told him not to publish it." Defendant testified that he thought the Attorney General said that the article stated,

"Mr. Egan wouldn't be disbarred because he would use the Handlin case in his campaign for Governor." The Attorney General testified that he advised defendant that, "In that article, you are quoted as saying that the court wouldn't dare to disbar Egan because of the decision of the court in the so-called perquisites case," and further advised him that Kingsbury had stated in an affidavit that he (defendant) stated, "You can print that too;" and that then defendant said, "I guess that's about right, except that I told Kingsbury not to publish it." The Attorney General also testified that he then told defendant, "You are invited to come up before the court;" to which defendant answered: "I'm not surprised at that; if Kingsbury said what you say he did, I don't see how the court could do anything else than invite me to come up."

A careful review of such evidence, as well as a consideration of the appearance of the witnesses upon the stand and their manner of testifying, fully satisfied every member of this court of the correctness of Kingsbury's version of the conversation, and that no mention was made therein as to any other reason why Mr. Egan would not be disbarred than the desire of this court that Egan should not use the decision of this court in the Handlin case in the coming campaign. The court has entered its findings in the contempt case, finding the facts as charged in the two proceedings, as hereinbefore set out. Upon such findings, we found the defendant guilty of contempt and rendered judgment that he pay a fine of $500. It is our purpose at this time to discuss the legal grounds for such judgment, and to determine what judgment should be entered in the disbarment proceeding.

[1] Was defendant guilty of contempt, and, if so, was the fine imposed warranted by the facts? A full understanding of the facts involved in, as well as of the decision of this court rendered in, the case of "Judge McCoy against the auditor," may be gained by a reference to the opinion of this court in McCoy v. Handlin, 35 S. D. 487, 153 N. W. 361. Courts should at all times exercise the greatest care not to infringe upon the constitutional right of free speech. But what is this constitutional right? It is that:

Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Section 5, Art. 6, Const.

The Supreme Court of Arkansas, in State v. Morrill, 16 Ark. 384, says of this constitutional provision, which, in similar wording, has been inserted in all the American Constitutions:

"Any citizen has the right to publish the proceedings and decisions of this court, and, if he deem it necessary for the public good, to comment upon them freely, discuss their correctness, the fitness· or unfitness of the judges for their stations, and the fidelity with which they perform the important · public trusts reposed in them; but he has no right to attempt by defamatory publications, to degrade the tribunal, destroy public confidence in it, and dispose the community to disregard and set at naught its orders, judgments, and decrees. Such publications are an abuse of. the liberty of the press, and tend to sap the very foundation of good order and well-being in society, by obstructing the course of justice. If a judge is really corrupt, and unworthy of the station which he holds, the Constitution has provided an ample remedy by impeachment or address, where he can meet his accuser face to face, and his conduct may undergo a full investigation. The liberty of the press is one thing, and licentious scandal is another."

The Supreme Court of our sister state has well said:

"Much has been said of the sacred rights of free speech. It is always conceded that the right is sacred, but at times such sacred right must give way to others, even more sacred. It has never been claimed that it will protect a man in invading a church and interrupting the sermon with his free speech. The free right of speech will not protect a man in obstructing the streets of a crowded city; the free right of speech may not be used to interrupt even social gatherings or political meetings. Should it, then, be allowed to interrupt the courts of justice? Surely there must come a time when the rights of the free speaker are overshadowed by the rights of other men to unhampered justice." State v. Nelson, 29 N. D. 155, 150 N. W. 267.

It is not, however, every abuse of the right of free speech, even when speech is directed toward the courts or their judges, that should be held to constitute a contempt of court. We agree fully with the following from the opinion in People v. Wilson, 64 Ill. 221 (16 Am. Rep. 528.)

"Let us say here, and so plainly that our position can be

misrepresented only by malice or gross stupidity, that we do not
deprecete, nor should we claim the right to punish, any criticism
the press may choose to publish upon our decisions, opinions, or
official conduct in regard to cases that have passed from our juris-
diction, so long as our action is correctly stated, and our official
integrity is not impeached.  *  *  *  Far be it from us to deny
that right.   Such freedom of the press is indispensable to the
preservation of the freedom of the people."

Although the courts do not agree as to the limits beyond
which they cannot properly go in punishing as a contempt the
abuse of the power of free speech when such speech is addressed
to such courts or the judges thereof, it is agreed by all courts
and text-writers that whenever a publication directly tends to
impede, embarrass, or obstruct the courts in the administration
of justice, it is a contempt of court and subjects the responsible
party to punishment therefor.   State v. Sweetland, 3 S. D. 503,
54 N. W. 415; State v. Edwards, 15 S. D. 383, 89 N. W. 1011;
6 R. C. L. 508, § 20; 9 Cyc, 20, 21, and cases cited in notes;
Cooley on Torts (3d Ed.) 820; 2 Bishop's Crim. Law, § 259.
Whenever the abuse of the right of free speech does directly
tend to impede, embarrass, or obstruct the courts in the adminis-
tration of justice, such courts are ordinarily remiss in their duty
to, and invite the just contempt and criticism of, the general
public, whose servants and protectors they are supposed to be, if
they overlook the same and allow it to go unpunished.   In the
Matter of Sturoc, 48 N. H. 428, 97 Am. Dec. 626; People v.
Wilson, supra; In re Philbrook, 105 Cal. 471, 38 Pac. 511, 884,
45 Am. St. Rep. 59; State v. Morrill, supra.   In this last case it
was said:

"It was well remarked  *  *  *  that no court could coerce
public respect for its decisions, and we may add that no sane
judge would attempt it.   If it were the general habit of the com-
munity to denounce, degrade, and disregard the decisions and
judgments of the courts, no man of self-respect and just pride of
reputation would remain upon the bench, and such only would
become the ministers of the law as were insensible to defamation
and contempt.   But, happily for the good order of society, man,
and especially the people of this country, are generally disposed
to respect and abide the decisions of the tribunals ordained by

government as the common arbiters of their rights. But where isolated individuals, in violation of the better instincts of human nature, and disregardful of law and order, wantonly attempt to obstruct the course of public justice, by degrading and exciting disrespect for the decisions of its tribunals, every good citizen, will point them out as proper subjects of legal animadversion."

We would refer any one seeking a comprehensive discussion of the question of constructive contempts to the most exhaustive discussions thereof to be found in the opinions in People v. Wilson, supra, State v. Morrill, supra, and in the case of State v. Frew, 24 W. Va. 416, 49 Am. Rep. 257. We quote the following from the words of Justice Snyder, in the Frew Case, when speaking of the court's power to punish for contempt:

"It is not given for the private advantage of the judges who sit in the court, but to preserve to them that respect and regard, of which courts cannot be deprived and maintain their usefulness. It is given that the law may be administered fairly and impartially, uninterrupted by any influence which might affect the rights of the parties or bias the minds of the judges; that the court may command that respect and sanctity so essential to make the law itself respected; and that the streams of justice may be kept pure and uncorrupted. If the court is scandalized and its motives or integrity impeached, in regard to official acts or conduct, the consequences cannot be otherwise than baneful. The administration of the law is embarrassed and impeded, the passions often unconsciously roused, the rights of the parties endangered, and a calm and dispassionate discussion and investigation of causes prevented.

"The public have a profound interest in the good name and fame of their courts of justice, and especially of the courts of last resort. Everything that affects the well-being of organized society, the rights of property, and the life and liberty of the citizen, is submitted to their final decision. The confidence of the public in the judiciary should not be wantonly impaired. It is all-important to the due and efficient administration of justice that the courts of last resort should possess in a full measure the entire confidence of the people whose laws they administer. All good citizens will admit that he who willfully and wantonly assails the courts by groundless accusations, and thereby weakens the

public confidence in them, commits a great wrong not alone against the courts, but against the people of the state."

The article, for the publication of which defendant is responsible, not only suggested something that might otherwise never have occurred to any member of this court—that Mr. Egan might be disposed to make political capital out of the decision in the Handlin case and a method by which he might be influenced to refrain from so doing—but it charges that this court, prompted by timidity and self-interest, will attempt to so influence Mr. Egan by failing to disbar him, and this regardless of the proof submitted to us. If such charge were true, those members of this court to whose shoulders the coat of infamy fitted would not only be unfit to occupy the position of high trust to which the people of this state have chosen them, but would be fit subjects for the righteous scorn of all men. Can it be possible that such a grave charge, made by one who has been an officer of this court for 24 years and entitled, under the license of other courts, to practice in this court since its organization, and who must be presumed to, as he does, know personally every member of this bench, will not reach some receptive ears? To conclude otherwise would certainly be to find that defendant's attack was harmless because of the very fact that he had long been a resident of this state and well known to her people, or else to find that the members of this bench were each and all so enshrined in the confidence and esteem of such people that no shaft of calumny, howsoever sharp or by whom cast, could reach them. The first we cannot believe to be true; the second, though much to be desired, we cannot hope to be true. Can it be possible that such a vile charge, even though disbelieved by every one to whose notice it was brought, would not tend to embarrass this court in the discharge of its duty in the Egan case? Certainly not. Its tendency being to embarrass the court, can either this court or the people of this state—no matter how great may be their confidence in this court—know that it will not be so embarrassed and, as a result thereof, its deliberation affected and the even course of justice disturbed? As is well said in People v. Wilson, supra:

"A court will, of course, endeavor to remain wholly uninfluenced by publications like that under consideration; but will the community believe that it is able to do so? Can it even be

certain in regard to itself? Can men always be sure of their mental poise? A timid man might be influenced to yield, while a combative man would be driven in the opposite direction. Whether the actual influence is on one side or the other, so far as it is felt at all, it becomes dangerous to the administration of justice. Even if a court is happily composed of judges of such firm and equal temper that they remain wholly uninfluenced in either direction, nevertheless a disturbing element has been thrown into the council chamber which it is the wise policy of the law to exclude.

"Regard it in whatever light we may, we cannot but consider the article in question as calculated to embarrass the administration of justice, whether it has in fact done so or not, and therefore as falling directly within the definition of punishable contempts."

Is it not a matter of common knowledge that a prophet takes peculiar glory in the truthfulness of his predicitons? Defendant said, "Just paste this prediction in your hat and see whether or not it is correct." If this court should, no matter how rightfully, render judgment in favor of Mr. Egan, can any one doubt that defendant, but for this proceeding and perhaps in spite thereof, would say, "I told you so." If, upon the other hand, this court renders judgment against Mr. Egan, will there be lacking those to say that such judgment was rendered that the court might escape the cry of, "I told you so"? In State v. Nelson, supra, a case very analogous in its facts to the case at bar, that court said:

"Such a charge certainly tends to embarrass the court in its decision. If the decision finally be in favor of the board of equalization, it will allow the same editor to point to the fact as corroboration of his claim that such conspiracy had existed; while, if the decision be in favor of the State University, well might the charge be made that the court had been intimidated by the charge made against it. The wrong done by the publication of the article is not so much against the court, or the members thereof, as against the litigants, against the taxpayers, and against the sacred foundations of justice upon which the liberties and lives of all citizens rest."

Analogus in their facts, and similar in the controlling principles involved, were the cases of In re Robinson, 48 Wash. 153

92 Pac. 929, 15 L. R. A. (N. S.) 525, 15 Ann. Cas. 415; Respublica v. Oswald, 1 Dall. 319, 1 L. Ed. 155, 1 Am. Dec. 246; In the Matter of Sturoc, supra; Ex parte Cole, 6 Fed. 35 [Fed. Cas. No. 2,973]; In re Collins, 147 Cal. 8, 81 Pac. 220; In re Philbrook, supra; State v. Bee Publishing Co., 60 Neb. 282, 83 N. W. 204, 50 L. R. A. 195, 83 Am. St. Rep. 531; People v. Stapleton, 18 Colo. 568, 33 Pac. 167, 23 L. R. A. 787. See, also, In re Egan, 24 S. D. 301, 123 N. W. 478. We would be powerless to frame a statement more pertinent to the facts of the present case. than the following from the Philbrook case, quoted by this court in Re Egan, supra:

"This is a palpable attempt to influence a decision of this court by base appeals to the supposed timidity of its justices, and made, too, by an officer of the court. It is intolerable. It cannot be suffered by any occupant of the bench who has a just sense of his duty to the people, to preserve the due dignity of their courts and the free course of justice."

Even if it be true as now argued by defendant and as we trust and believe, that, owing to the integrity of the members of this court, the administration of justice cannot and will not be impeded or disturbed, can it be claimed that defendant has done no harm and therefore should not be punished? Can the degree of a defendant's guilt in any manner depend, not upon what he has done, but upon the integrity or lack of integrity in the breasts of those who chance to constitute the court? The answer is too obvious for doubt. 2 Bishop's Crim. Law, § 260; In the Matter of Sturoc, supra; People v. Wilson, supra; 6 R. C. L. 514, § 26.

[2] Defendant urges that he did not intend, by anything he said, to reflect upon the integrity of this court, or to embarrass it in the discharge of its duties. There is a well-established rule of law that one is presumed to intend the natural results of his acts— one cannot willfully deal a blow to another and be heard to say that he intended no harm. Denying a wrong intent is only an excuse, but no justification, where the words are in fact contemptuous. People v. Freer, 1 Caines (N. Y.) 484. It is not enough that defendant disclaim any intentional disrespect to the court, or any design to embarrass the administration of justice. His meaning and intent must be determined by a fair interpretation of the

language used by him. People v. Wilson, supra. As was said in the Sturoc case:

"The character of the article and the time and circumstances of the publication oblige us to find that, as this was the natural, so it must have been the intended, effect of the publication. The natural consequences of his act being to corrupt the administration of the law, the defendant cannot discharge himself by alleging that he meant no harm, and did not suppose that he was doing anything illegal." People ex rel. Elliott v. Green, 7 Colo. 237, 3 Pac. 65, 49 Am. Rep. 351; 9 Cyc. 25, and numerouse cases cited.

[3] It might be asked: Why did the court fine this defendant $500, when, for publishing this article, the corporation publishing the same was, in State v. Hipple Printing Company, 154 N. W. 292, fined but $100? The answer is obvious. The publishing company, through its reporter, received the statements from one of the most widely known attorneys of the state—one whom it had a right to presume knew what could be lawfully published. This attorney authorized the publication thereof, thus, by implication at least, assuring such publishing company that it could lawfully publish the same. Defendant is not a layman, one to whom a mere presumption of the knowledge of the law regarding this matter attaches; he has for years been an attorney of this court and surely is familiar with section 697, Pol. Code, which provides:

"It is the duty of an attorney and counselor: (1) To maintain the respect due to the court of justice and judicial officers."

Moreover, in order to receive, from this court, his license as an attorney thereof, defendant gave oath that he would "act in the office of attorney and counselor at law * * * with all good fidelity * * * to the court." We have no doubt but that defendant is familiar with the Code of Professsional Ethics adopted by the American Bar Association and ratified by the State Bar Association of this state; being familiar therewith, he must have known that his conduct conflicted with the provisions of sections 1 and 20 of such Code and was a breach of the "oath of admission" proposed in such code. In State v. McClaugherty, 33 W. Va. 250, 10 S. E. 407, it was said:

"If one private citizen should make such a false accusation against another, it would be a base act, and when it is made against a judge, in respect to his official conduct, by an officer of

his court, the offense is greatly aggravated and intensified, and manifests a much greater degree of turpitude and depravity."

In Re Collins, supra, the court said:

"None should have known better than he his duty and obligation as an attorney, and that under his oath of office he was bound 'to maintain the respect due to the courts of justice and judicial officers,' and 'to employ for the purpose of maintaining the causes confided to him such means only as are consistent with truth.' "

Last, but not least, defendant is not the mere instrument through which this publication reached the people; he it is who gave birth to it.

[4-5] What should be the judgment of the court in the disbarment proceedings? At the threshold of this part of our discussion it is well to differentiate between the two proceedings before us. As we have noted, one is to preserve the dignity of the court; this is accomplished through the punishment of those who offend against it. The other is to remove from the profession a person whose misconduct has proved him unfit to be intrusted with the duties and responsibilities belonging to the office of an attorney. In the one proceeding, punishment is the means by which the end is sought to be accomplished; in the other, punishment has no appropriate place. The one is quasi criminal in its nature. State v. Edwards, supra. The other, though the misconduct complained of may constitute contempt of court or even be a crime against the state, is purely civil. In re Kirby, 10 S. D. 338, 73 N. W. 95; Wernimont v. State, 101 Ark. 210, 142 S. W. 194, Ann. Cas. 1913D, 1156; State v. Root, 5 N. D. 487, 67 N. W. 590, 57 Am. St. Rep. 568; State v. McRae, 49 Fla. 389, 38 South. 605, 6 Ann. Cas. 580; Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552; Randall v. Brigham, 7 Wall. 523, 19 L. Ed. 285; Ex parte Finn, 32 Or. 519, 52 Pac. 756, 67 Am. St. Rep. 550; Weeks on Attorneys at Law, § 80; Thornton on Attorneys at Law, § 867. In the Wernimont Case it is said:

"Proceedings for the suspension or disbarment of attorneys for professional misconduct are not criminal, but civil in their nature. They are not instituted or intended for the purpose of punishment. Their object is to preserve the purity of the courts and the proper and honest administration of the law. Attorneys

are officers of the court, made so by its order when they are ad-
mitted to practice therein. The purpose of the proceedings for
suspension and disbarment is to protect the court and the public
from attorneys who, disregarding their oath of office, pervert and
abuse those privileges which they have obtained by the high office
they have secured from the court. The right to practice law is
not an absolute right, but a privilege only. It is but a license
which the court grants by its judgment of admission to the bar,
and which the same court may revoke whenever misconduct ren-
ders the attorney holding such license unfit to be entrusted with
the powers and duties of his office. The revocation of such license
is therefore only a civil proceeding, governed by the rules applic-
able to all civil actions."

That the same conduct that warrants punishment for contempt
may justify disbarment is too clear for argument. As said by the
court in Beene v. State, 22 Ark. 151:

"The power of the court to punish  *  *  *  for contempt, by
fine and imprisonment, is one thing, and its power to strike an
attorney from the roll is another and distinct thing, though the
misconduct for which an attorney may be disbarred may, in some
instances, involve a contempt of court."

It does not however, follow that every act of an attorney
that constitutes a contempt of court would necessarily warrant the
court in canceling or even suspending the license of such at-
torney. While this proceeding is civil in its nature, its results
may be most serious to the one disbarred. This was fully recog-
nized by this court in Re Egan, supra, as well as in Re Kirby, 10
S. D. 322, 414, 73 N. W. 92, 907, 39 L. R. A. 856, 859. The
mere payment of a fine may be as naught compared with the mis-
fortune of being deprived of the means of livelihood and the
disgrace and mortification that must come to one declared unfitted
to practice an honorable profession. As was said in People ex
rel. Elliott v. Green, supra:

"The grave and delicate responsibility imposed upon this
court by the statute is duly appreciated. The profession of an
attorney is to him of the highest importance. It comprises his
regular means of subsistence. No argument therefore is neces-
sary to show that the power of striking from the roll should be
most judiciously exercised. The case should be clearly made out

to warrant a removal from the bar, and the removal should appear to be necessary either to the maintenance of that degree of respect which is due to courts and judges, or to preserve the respectability of the legal profession itself. The power should never be arbitrarily exercised."

In People v. MacCabe, 18 Colo. 186, 32 Pac. 280, 19 L. R. A. 231, 36 Am. St. Rep. 270, the court says:

"A court intrusted with the power to admit and disbar attorneys should be considerate and careful in exercising its jurisdiction; the interests of the respondent must in every case be weighed in the balance against the rights of the public; and the court should endeavor to guard and protect both with fairness and impartiality."

In this connection the words of Chief Justice Marshall in Ex parte Burr, 9 Wheat, 529, 6 L. Ed. 152, are most appropriate:

"On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion ought to reside in the court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised; and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the court itself."

[6] Defendant does not stand before us charged and convicted of having violated any duty he owed a client; he does not stand charged and convicted of having taken advantage of his position as attorney that he might overreach and wrong a client to his own financial gain; he does not stand charged and conicted of having made a wrongful use of the courts, or of any of the various instrumentalities of the law under his control, to wrong his fellowman; he does not stand charged and convicted of unprofessional conduct toward his fellow attorneys; he is not even charged and convicted of a long-continued course of contemptuous conduct toward this and other courts. With one single exception, other than the misconduct of which he now

stands convicted, so fas as this court is advised, defendant has always maintained, toward this and the other courts of this state, that respect and courtesy that is due the courts from its attorneys, and has never before sought, in any manner or degree, to weaken or destroy the confidence of the public in the courts. The exception above noted occurs in this defendant's brief presented to this court in the case of McCoy v. Handlin, supra. In our opinion in that case it will be found that we called attention to the absence, in such brief, of reference to authorities supporting defendant's contentions upon the real issues then before us; in such opinion we also expressed surprise at counsel's having quoted, as though from the opinions therein, the mere argument of counsel presented in a certain leading case, the opinions in which were in direct conflict with such argument and were directly opposed to defendant's contentions. But it was not these features of defendant's brief in McCoy v. Handlin, supra, that showed lack of respect, in fact constituted such contempt of court as would ordinarily have required action on the part of this court. In such brief, counsel said:

"The issuing of the order to show cause in this case implies the right to answer it. It implies that, if legal cause is shown by Mr. Handlin why Judge McCoy should not have this money, the court will so decide. Under the answer, a matter which will not be disputed, each of the judges of this court have for years been accepting the money under this same act of the Legislature which the defendant claims is unconstitutional. To hold with Mr. Handlin would be for the judges to admit that they have been purloining the treasury of this state during that period * * * Could I stand before you convinced clearly as I am that the act of the Legislature attempting to give you $50 per month in addition to your salary clearly violated the Constitution, and ask you to hold yourselves guilty? Could you admit your guilt?

And again he said:

"You were elected judges of this court, you took the oath of office, you knew what the Constitution provided, and it would take only a child, simply, were he not biased, to see that the donation offered you under section 239 is nothing but graft. * * * While that Constitution does exist, you and I alike must

live within it, or be entitled to wear the brand of a Benedict Arnold."

And defendant closed his brief with the quotation: "Mene, Mene, Tekel Phares."

What language could have been more insulting and contemptuous—what language could have tended more strongly to embarrass this court in the proper discharge of a duty, unpleasant in its very nature, and one from which it would have been only too glad to escape if the Constitution of this state had but given it an avenue of escape? With what were the members of this court charged? Not that we had innocently, and through a mistaken belief that the law in question was constitutional, taken that which did not belong to us. No, we were charged with being grafters; yes, with even being purloiners of the state's treasury—in other words, thieves. Not content with that, we are charged with knowing the provisions of the Constitution and with failing to heed the same, and thus meriting the brand of a traitor—one guilty of treason to his country. And then, as though to warn us of the fate awaiting us at the hands of an outraged people, our attention is drawn to "the handwriting on the wall." For lesser offenses, a brief submitted to the court by the defendant in Re Robinson, 48 Wash. 153, 92 Pac. 929, 15 L. R. A. (N. S.) 525, 15 Ann. Cas. 415, was ordered stricken from the files and defendant suspended from practice for a period of six months, and in Re Philbrook, supra, the defendant was suspended from practice for a period of three years and thereafter until the further order of the court removing the suspension. It would be an insult to the intelligence of defendant to even suggest that he may not have not known the impropriety of putting such matter into a brief—a document whose sole legitimate purpose is to aid the court in determining the issues of law and fact raised in the particular case. Even overlooking the contemptuous features of such brief, a reading thereof can but convince any lawyer that such brief was not designed to aid this court in reaching a correct conclusion in the case then before us, but was designed for the sole purpose of general distribution, to mislead the general public as to what was in issue in such case, and thus, when this court should have decided the case, to leave with the public a wrong impression as to what had actually been decided. After

the opinion of this court in the case of McCoy v. Handlin was handed down, defendant published the same in pamphlet form, inserting criticisms thereof in footnotes. It is evident, from statements therein made, that defendant intended such pamphlets for general distribution. Each member of this court was furnished one by the defendant, and we trust one has come into the hands of every lawyer in the state. Because copies were thus furnished this court, we feel warranted in referring thereto, especially for the purposes hereinafter expressed. Such pamphlet contains the following introduction:

"The Opinion of the Court and Commentary Thereon by Joe Kirby of the Sioux Falls Bar.

"Believing that no case involving questions of such momentous importance has heretofore come before the courts of our state, also fearing that many of the misstatements made by the court would go into history unchallenged and in turn form the basis for misapplication of the law I have concluded to present in this form the opinion of the court and point out some of the many errors therein contained."

And such pamphlet contains an extensive "Conclusion," in which we find the following:

"I want it understood that the publication of the foregoing opinion with my notes thereto is not the grumblings of a defeated lawyer but written with the hope than when it is examined in connection with such notes, it will awaken a disapproval among the people of our state and particularly among the members of my profession."

It may be asked: (1) Why was not such misconduct made the basis of contempt or disbarment proceedings? (2) Why it is referred to at this time? Both of these questions deserve answer.

Answering the first question, we repeat what we have already stated herein in relation to such misconduct:

"Courts are ordinarily remiss in their duty to, and invite the just contempt and criticism of, the general public * * * if they overlook the same and allow it to go unpunished."

But there must and will arise extraordinary cases—those with unusual surroundings—which require unusual treatment. That which is demanded of us above all else is that we do nothing that will weaken or destroy the confidence of the public in the courts,

and this even if, to avoid such result, we refrain from doing that which duty would ordinarily demand of us. This court overlooked this former misconduct on the part of defendant, lest there be right-minded people, who, understanding the direct financial interest which every member of the court had in the result of that case, would misjudge the motive prompting it, if it meted out to defendant that punishment which his misconduct warranted, and believe that such action as it took was attributable to a spirit of revenge; lest action might be more dangerous to the public weal than inaction, it elected to take no action. In this proceeding the court refers to and considers such matters, not against defendant, but, as hereinafter shown, in his behalf.

Answering the second question, we would say that we now call attention to such prior misconduct, to the criticism of defendant's brief found in our opinion in the case of McCoy v. Handlin, supra, to the other peculiarities of such brief, and to defendant's published criticism of our opinion, because therein we find that which, to our minds, furnishes conclusive explanation of the misconduct with which defendant now stands charged. Defendant's mind is so engulfed in the thought that he has a great duty to discharge—"to awaken a disapproval (of this court's decision in the McCoy-Handlin Case) among the people of our state and particularly among the members of my profession"—that the clear light of reason, that usually directs such mind, is unable to enter therein, leaving him as one suffering an illusion; under no other theory are we able to explain defendant's remarkable and unjustifiable conduct.

Believing that the misconduct of which defendant stands charged does not, when considered alone, show the defendant so unfitted to be an attorney of this court as would authorize a judgment of disbarment; believing that, in all else, save perhaps that one matter in respect to which he seems to be suffering an illusion, defendant will hereafter act toward this court with all due respect; believing that suspension of his rights as an attorney would not hasten the time of his disillusion, the only fact that would warrant such suspension; and believing that the public, whose servants we are and whose best interests we seek to promote will approve of our giving to defendant the benefit of any doubt we may have as

14—Vol. 36, S. D.

to what our judgment should be: We are of the opinion that the disbarment proceeding should be dismissed. Such proceedings are dismissed without costs.